[No. 67459-5-I.   Division One.   December 10, 2012.]

JOHN BEHNKE ET AL., *as Trustees and on Behalf of Two Named Trusts, Appellants*, v. EDWARD AHRENS ET AL., *Respondents*.

282

*Darrell D. Hallett* (of *Chicoine & Hallett*); *Kenneth W. Masters* and *Shelby R. Frost Lemmel* (of *Masters Law Group PLLC*); and *Christopher C. Pence* (of *Law Office of Christopher Pence PLLC*), for appellants.

*Robert M. Sulkin, Barbara H. Schuknecht*, and *Malaika M. Eaton* (of *McNaul Ebel Nawrot & Helgren PLLC*), for respondents.

¶1 BECKER, J. — Appellants employed a capital gains tax reduction strategy that landed them in trouble with the Internal Revenue Service (IRS). They brought several

claims against their attorney Edward Ahrens on grounds
that he failed to disclose the extent of his business relation-
ship with the company whose tax shelter plan he recom-
mended. Because appellants made an inadequate response
to Ahrens' motion for summary judgment on their claim
that he violated the Consumer Protection Act, chapter 19.86
RCW, we affirm the order dismissing that claim. Their
claims of breach of fiduciary duty and malpractice went to
trial and resulted in a minimal award of damages. Their
claim that Ahrens violated the Rules of Professional Con-
duct (RPCs) was decided by the court and resulted in an
order to disgorge fees. Because the trial court handled these
matters properly, the appellants' request for a new trial on
damages is denied.

## FACTS

¶2  John and Carl Behnke are cotrustees of multi-million-
dollar trusts. In 2001, on the advice of financial advisors,
they considered selling the trusts' concentrated holdings in
low-basis stocks. An accounting firm advised them on a
strategy to reduce anticipated capital gain taxes. They were
referred to Edward Ahrens, an attorney, for a second opin-
ion. Ahrens held himself out as a specialist in tax matters.

¶3  The Behnkes entered into an attorney-client relation-
ship with Ahrens on October 23, 2001. Ahrens advised them
the accounting firm's proposal was not suitable. The
Behnkes asked about other potential tax-saving alterna-
tives. Ahrens recommended a tax shelter known as a "752"
or "Son of BOSS"[1] plan. The complicated mechanics of the
plan involve creating artificial losses that are then claimed
as a deduction.

¶4  Ahrens informed the Behnkes of organizations that
carry out these plans. One was the Heritage Organization,
located in Texas. Ahrens arranged meetings in Seattle in

---

[1] The name derives from an earlier tax shelter scheme called BOSS, which
stands for Bond and Option Sales Strategy.

November 2001 between Heritage, himself, and the Behnkes. The Behnkes entered into a contract with Heritage and decided to use the Heritage 752 plan. They ultimately paid Heritage more than $1.7 million and became obligated to Heritage on approximately $2 million of promissory notes for a plan they hoped would save them more than $15 million in taxes. On Heritage's recommendation, the Behnkes retained the law firm of Lewis, Rice & Fingersh LLC, located in St. Louis, Missouri, to provide a legal opinion on the validity of the plan. They paid the Lewis firm $175,000 in fees. They would eventually pay more than $800,000 to other professionals who assisted them as events unfolded.

¶5 Ahrens sent the Behnkes an engagement letter, dated December 13, 2001. The letter stated that Ahrens' law firm would represent the cotrustees in the "planning project" that they were intending to do with Heritage and the Lewis firm. The work would include review of the documents and legal opinions related to implementing the project. Ahrens would eventually receive $12,325 for his services to the Behnkes, half of which was to be paid by Heritage.

¶6 In the engagement letter, Ahrens disclosed he had previously represented and continued to represent Heritage. What Ahrens did not disclose was the extent and nature of his continuing attorney-client and business relationship with Heritage. From 1998 through 2002, Ahrens and his firm performed nearly daily legal services for Heritage. Also, acting through a corporation, Ahrens designed variations of "752" tax reduction strategies and sold or licensed them to Heritage. Heritage promoted and sold Ahrens' strategies. The licensing fees Ahrens' corporation received from Heritage totaled $3,720,000 before Ahrens began to represent the Behnkes and $1,043,000 afterwards.

¶7 In April 2002, the Lewis firm opined that the plan developed for the Behnkes by Heritage was sound and began, with Heritage, to help them carry it out. At this time, the IRS was stepping up enforcement against what it

considered to be abusive tax strategies. In late 2003, the Behnkes hired Preston, Gates & Ellis for more advice. Attorneys at Preston told them the IRS considered the strategies they were using abusive, and recommended paying the taxes rather than trying to litigate the validity of the tax shelter. The Behnkes decided at first to continue with the plan. Then in 2005, they decided against litigation and elected instead to settle with the IRS. The IRS declared the trusts' 752 transaction to be an abusive tax shelter. All tax benefits were disallowed. The trusts paid $5,755,517 in capital gains taxes and $582,189 in penalties.

¶8 The Behnkes sued Ahrens in September 2006. Among their claims were fraud, violation of the Consumer Protection Act, breach of fiduciary duty, and legal malpractice. Ahrens moved for summary judgment dismissing all claims. On March 12, 2009, the trial court granted the motion in part, dismissing the claim under the Consumer Protection Act. The court permitted the fraud and malpractice claims and a common law claim for breach of fiduciary duty to proceed to trial by jury.

¶9 The Behnkes also asserted a cause of action for breach of fiduciary duty based on the RPCs, specifically RPC 1.7(b). The court ruled that the RPC-based claim would not be submitted to the jury, as it presented a question of law that only the court could decide.

¶10 The jury trial took place in October and November 2009. Using a special verdict form proposed by the Behnkes, the jury rejected the fraud claim but found that Ahrens breached a fiduciary duty and committed malpractice. The special verdict form required the jury to itemize the damages these breaches caused the Behnkes in seven categories: fees paid to Heritage, fees paid to the Lewis firm, fees paid to the Ahrens firm, fees paid to Preston, fees paid to their attorneys in the Heritage bankruptcy case in Texas, additional capital gains taxes, and tax penalties. The only category for which the jury awarded damages was fees paid to Ahrens. The amount awarded was $6,162.25. The jury

then determined that the Behnkes were contributorily negligent and attributed 47 percent of the damages to them.

¶11 After the jury delivered the verdict, the court discharged the jury and heard argument on the plaintiffs' claim that Ahrens' conduct was a violation of the RPCs. In findings of fact and conclusions of law entered on March 8, 2010, the court found that Ahrens did have a conflict of interest that violated RPC 1.7(b):

18. Mr. Ahrens testified and the Court finds that Mr. Ahrens knew that whether or not Heritage paid him the 752 licensing payments was entirely dependent upon the goodwill and discretion of Heritage's owner, and he considered being on the owner's good side an important factor in whether he would be paid. Ahrens further testified and the Court finds that Ahrens knew that one way of being on Heritage's owner's good side was for Ahrens to refer clients like Plaintiffs to Heritage.

. . . .

20. Ahrens' engagement letter's sole disclosure regarding the continuous attorney-client relationship between Ahrens and Heritage states only: "we have previously represented and continue to represent The Heritage Organization." The letter does not limit Ahrens' promised scope of representation or responsibilities to the Trusts on account of Ahrens' attorney-client relationship between Heritage and Ahrens or advise the trustees of any risks or implications of his dual legal representation of Heritage and the Trusts, or of the business and financial relationship between Heritage and Ahrens.

21. At trial Ahrens testified that, contrary to the written engagement letter, he orally informed the trustees that he would not represent the Trusts in any matters adverse to Heritage because he also represented Heritage. Ahrens also testified he was instructed by one of the trustees to limit the services Ahrens had promised in the engagement letter to perform. The Court finds that this testimony is not credible and that Ahrens was not authorized to limit the scope of the representation he agreed to provide.

. . . .

3. Defendant breached his fiduciary duty of undivided loyalty to Plaintiffs by violating RPC 1.7(b). Defendant was prohibited by RPC 1.7(b) from undertaking Plaintiffs' representation because it was apparent Plaintiffs' representation may be materially limited by Defendant's personal financial dealings with Heritage and Defendant's attorney-client relationship with Heritage and because Defendant did not fully disclose to Plaintiffs the material facts of his personal business and attorney-client relationships with Heritage and obtain Plaintiffs' written consent.

Findings of Fact 18, 20-21; Conclusion of Law 3.

¶12 The court ruled that disgorgement of fees was the only permissible civil remedy for breach of a lawyer's fiduciary duty of undivided loyalty based on violation of the RPC conflict of interest rules. Accordingly, the court rejected the Behnkes' request for an award of substantial actual damages, including taxes and penalties, as a consequence of RPC violation. The court ordered Ahrens to disgorge and pay the Behnkes $12,325.00, the total attorney fees received for representing them, plus prejudgment interest. The result was a judgment for $16,597.28.

¶13 The Behnkes then moved for additur in connection with the jury verdict. The trial court denied the motion.

¶14 The Behnkes appeal.

## CONSUMER PROTECTION ACT

¶15 Before trial, Ahrens moved for summary judgment, contending that all of the Behnkes' claims should be summarily dismissed. The trial court dismissed only the claim for violation of the Consumer Protection Act.

¶16 Summary judgment is proper only when pleadings, depositions, admissions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. This court engages in the same inquiry as the trial court. We consider the facts in the light most favorable to the nonmoving party. Review

is de novo. CR 56(c); *Fid. Mortg. Corp. v. Seattle Times Co.*, 131 Wn. App. 462, 467-68, 128 P.3d 621 (2005). Bare assertions that a genuine material issue of fact exists will not defeat a summary judgment motion in the absence of actual evidence. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

¶17 The Consumer Protection Act declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. RCW 19.86.020. To prevail in a private Consumer Protection Act claim, the plaintiff must prove (1) an unfair or deceptive act or practice (2) occurring in trade or commerce (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

¶18 Below, Ahrens argued that the Behnkes lacked evidence to support the first and third elements, an unfair or deceptive act or practice affecting the public interest.

¶19 To meet the "unfair or deceptive act or practice" element, a plaintiff "need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785. To meet the "public interest" element, a private plaintiff must show "not only that a defendant's practices affect the private plaintiff but that they also have the potential to affect the public interest." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 74, 170 P.3d 10 (2007).

¶20 In arguing to the trial court that Ahrens could not establish these two elements, Ahrens relied on *Swartz v. KPMG, LLC*, 401 F. Supp. 2d 1146 (W.D. Wash. 2004), *aff'd in part and rev'd in part*, 476 F.3d 756 (9th Cir. 2007). On appeal, the Behnkes argue that *Swartz* misinterpreted our Washington statute and should not be followed.

¶21 In *Swartz*, the plaintiff had received $18 million from the sale of a business. He engaged in some question-

able transactions as part of a tax plan designed by his accounting firm to offset his capital gains and diminish his tax liability. He received a notice from the IRS that the tax plan did not produce bona fide deductions for income tax purposes. He sued various defendants on various theories. Most of his claims, including a claim for violation of the Consumer Protection Act, were dismissed for failure to state a claim. As to the Consumer Protection Act claim, the court said that wealthy investors looking for tax shelters are too small a group to qualify as "a substantial portion of the public" and that "the tribulations of millionaires" do not affect the public interest:

> The number of consumers who could conceivably find themselves in plaintiff's circumstances—looking for a tax savings on millions of dollars of capital gains—is extremely small and unable to qualify as "a substantial portion of the public" under any reasonable definition of that term. As a matter of law, conduct directed toward a small group cannot support a CPA [Consumer Protection Act] claim. . . .
>
> . . . .
>
> For reasons similar to those stated above, plaintiff cannot establish that his dilemma is one which affects the public interest. The tribulations of multimillionaires are not the focus of the legislative intent behind the CPA; as a (very small) group, the extremely wealthy are neither unsophisticated nor easily subject to chicanery. *See Goodyear Tire & Rubber Co. v. Whiteman Tire Inc.*, 86 Wn. App. 732, 935 P.2d 628 (1997), where a CPA claim was dismissed on public interest grounds based on a finding that the plaintiff was "not representative of bargainers vulnerable to exploitation."

*Swartz*, 401 F. Supp. 2d at 1153-54. The Ninth Circuit Court of Appeals, affirming per curiam, adopted the district court's opinion on the Consumer Protection Act issue. "We note that a scheme marketed to a 'select audience' of persons with millions of dollars of capital gains to shield from taxation lacks the capacity to deceive a substantial portion of the public." *Swartz*, 476 F.3d at 761.

■ ¶22 The Behnkes rightfully complain that *Swartz* misinterprets Washington law. The Consumer Protection Act does not exclude millionaires from its remedies. The act provides that "any person who is injured in his or her business or property by violation" of the Consumer Protection Act may bring a civil action to recover damages. RCW 19.86.090. The act is to be liberally construed. RCW 19.86-.920. "Any person" means "any person." It is not a means-tested category. Nothing in the language of the act demonstrates a legislative intent to "focus" on the problems of low-income or middle-income people to the exclusion of high-income people. Indeed, our Supreme Court has already indicated that an investor has a viable Consumer Protection Act claim against an attorney who simultaneously represents the promoter of a tax shelter scheme if the attorney "failed to disclose the conflict for the purpose of obtaining clients or increasing profits." *Eriks v. Denver*, 118 Wn.2d 451, 465, 824 P.2d 1207 (1992).

■ ¶23 Whether a deceptive act has the capacity to deceive a substantial portion of the public is a question of fact. *Holiday Resort Cmty. Ass'n v. Echo Lake Assocs.*, 134 Wn. App. 210, 226-27, 135 P.3d 499 (2006), *review denied*, 160 Wn.2d 1019 (2007). Washington courts have not tried to decide as a matter of law whether the potential victims of a deceptive act or practice are sufficiently numerous to qualify as "a substantial portion of the public." For example, it is likely that persons who purchase expensive race horses are a relatively wealthy and small group, but this was not a bar to recovery in *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 406, 759 P.2d 418 (1988). *See also First State Ins. Co. v. Kemper Nat'l Ins. Co.*, 94 Wn. App. 602, 971 P.2d 953 (excess liability carrier had a Consumer Protection Act claim against a primary insurer), *review denied*, 138 Wn.2d 1009 (1999).

■ ¶24 In applying the requirement that the allegedly deceptive act has the capacity to deceive "a substantial portion of the public," the concern of Washington courts has

been to rule out those deceptive acts and practices that are unique to the relationship between plaintiff and defendant. *Burns v. McClinton*, 135 Wn. App. 285, 303-06, 143 P.3d 630 (2006), *review denied*, 161 Wn.2d 1005 (2007); *Brown v. Brown*, 157 Wn. App. 803, 815-17, 239 P.3d 602 (2010). The definition of "unfair" and "deceptive" must be objective to prevent every consumer complaint from becoming a triable violation of the act. Thus, our Supreme Court has said that actionable deception exists where there is a practice likely to mislead a "reasonable" or "ordinary" consumer. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (collection notices had the capacity to deceive a substantial portion of the public because language could induce people to remand payment in the mistaken belief they had a legal obligation to do so).

¶25 "The purpose of the capacity-to-deceive test is to deter deceptive conduct *before* injury occurs." *Hangman Ridge*, 105 Wn.2d at 785. This purpose would be frustrated by amorphous numerical thresholds established ad hoc by the courts.

■■ ¶26 As for determining whether the complained of conduct affects the public interest, this element also is factual in nature. *Hangman Ridge*, 105 Wn.2d at 791. Where the transaction was essentially a private dispute rather than essentially a consumer transaction, it may be more difficult to show that the public has an interest in the subject matter. *Hangman Ridge*, 105 Wn.2d at 790. Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest. This is often the case with legal services, which are not within trade or commerce except as they relate to the entrepreneurial aspects of the practice of law. *Eriks*, 118 Wn.2d at 463-64. It is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest. *Hangman Ridge*, 105 Wn.2d at 791.

¶27 In concluding that the deceptive marketing of tax shelters did not affect the public interest, the *Swartz* court generalized that "the extremely wealthy are neither unsophisticated nor easily subject to chicanery." *Swartz*, 401 F. Supp. 2d at 1154. Washington law does not support this reasoning. Anyone, regardless of wealth or sophistication, can fall victim to deception in trade or commerce. *Swartz* cited *Goodyear Tire*, 86 Wn. App. at 745. In that case, Goodyear Tire sued an independent dealer for amounts due on an open account. The dealer's counterclaim alleged that Goodyear violated the Consumer Protection Act by opening its own stores in the area and using unfair competitive tactics. First, the court held that Goodyear had committed no unfair or deceptive acts. Second, there were few indicators of public interest in what was basically a private dispute. Through his long business relationship with Goodyear, the plaintiff had the experience necessary to judge the risks involved in continuing that relationship. *Goodyear Tire*, 86 Wn. App. at 745. *Goodyear Tire* simply applies the "public interest" element as analyzed in *Hangman Ridge*, 105 Wn.2d at 790-91, to the facts of a particular private dispute. It does not support the generalization that wealthy people are too sophisticated to be deceived.

¶28 In short, because the reasoning in *Swartz* is not authoritative, it has no application in the Behnkes' appeal.

¶29 Nevertheless, the trial court did not err in dismissing the Behnkes' Consumer Protection Act claim on summary judgment.

¶30 In our original opinion in this matter, we explained that we did not find in the record any response by the Behnkes to Ahrens' motion for summary judgment dismissing the Consumer Protection Act claim. We said it was not surprising, then, that the trial court dismissed the claim. The Behnkes moved for reconsideration. They showed that they did submit a brief to the trial court responding to the motion to dismiss the Consumer Protection Act claim, and they did designate it as part of the appellate record.

Because of a clerical error, a different brief was included in the record instead of the one designated. We permitted the Behnkes to supplement the appellate record with the missing brief from the trial court's summary judgment record.

¶31 Having reconsidered the parties' arguments on appeal in light of the missing brief, we reach the same conclusion as in our original opinion.

¶32 On appeal, the Behnkes identify the deceptive act as Ahrens failing to disclose that he had a direct financial interest in the transaction about which he was advising his clients. To establish an unfair or deceptive act, there must be shown a real and substantial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated. *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 604-05, 200 P.3d 695 (2009); *see Burns*, 135 Wn. App. at 306 (accountant failed to tell his client he was overcharging him; because their relationship was unique, plaintiff did not establish a practice with the potential to deceive other members of the public). Ahrens contends the record lacks evidence that his alleged nondisclosure was likely to be repeated with other clients. The Behnkes reply with citations to the record showing that Ahrens wrote engagement letters to other clients in which, similar to his letter to the trusts, he failed to disclose the extent of his payments from Heritage.

¶33 The citations offered by the Behnkes on appeal are to the record as it later developed, not to the record on summary judgment. Our review of a summary judgment ruling is confined to evidence specifically called to the attention of the trial court. RAP 9.12. Opposition to summary judgment cannot succeed based on speculation. *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wn. App. 412, 438-39, 40 P.3d 1206 (2002).

¶34 The missing brief and the citations to the record contained in it do not add material support to the Consumer Protection Act claim. The Behnkes' motion for reconsideration argues that they did not need to provide factual

evidence because Ahrens' motion for summary judgment relied solely on the rationale in *Swartz* and thus presented a purely legal question of statutory interpretation. We do not share this perception of the briefing below. The Behnkes' missing brief recognized that the motion for summary judgment put element one and element three at issue. Their brief cited evidence in the record and argued that a fact finder could find that Ahrens' failure to disclose his conflict of interest was conduct he "repeated over and over with other clients."

¶35 The evidence in the record cited by the missing brief does not bear out this claim of repetitive nondisclosure. It establishes that Ahrens represented other clients with respect to the controversial tax strategy, but it does not establish that the alleged deceptive act—failure to disclose aspects of his continuing financial relationship with Heritage—was repeated with these other clients or was likely to be repeated with other future clients.

¶36 Given the belated, conclusory, and speculative nature of the Behnkes' response below, the trial court did not err in dismissing the Consumer Protection Act claim on summary judgment.

## DAMAGES

¶37 The Behnkes raise three additional issues, all of them aimed at trying to get a new trial on damages. We address each theory in turn.

¶38 First, the Behnkes contend the trial court erred in refusing to award them their actual damages, including taxes, penalties, and the fees they paid to Heritage and other professionals. The Behnkes argue that the court was sitting in equity and should have exercised its broad discretion to fashion broad remedies and do substantial justice.

¶39 A claim seeking damages against an attorney for breach of fiduciary duty is legal, not equitable. *See*

*Kelly v. Foster*, 62 Wn. App. 150, 154-55, 813 P.2d 598, *review denied*, 118 Wn.2d 1001 (1991). The Behnkes had their opportunity to get damages when their claims of breach of fiduciary duty and malpractice were submitted to the jury. The Behnkes contend the jury's verdict was only advisory. They are mistaken. The court's oral ruling, incorporated into the written findings, made clear that the jury's verdict on damages was binding: "We submitted the common law breach of fiduciary issue to the jury, and they decided it, and I do not want anything I do here to be construed as challenging or speculating or undoing the jury's decision."

¶40 The trial court reserved to itself the decision on whether Ahrens breached the RPC requirement of undivided loyalty, but not for the purpose of giving the Behnkes a second chance to obtain the damages the jury refused to award. Taking the RPC issue away from the jury simply recognized that the question of whether an attorney's conduct violated the relevant RPCs is a question of law for the court to decide. *Eriks*, 118 Wn.2d at 457-58.

¶41 Violations of the RPCs do not give rise to an independent cause of action for malpractice and may not be used as evidence of malpractice. *Hizey v. Carpenter*, 119 Wn.2d 251, 259-60, 830 P.2d 646 (1992). In a malpractice case, an expert witness may not explicitly refer to the ethical rules, nor may the existence of the rules be revealed to the jury via instructions. *Hizey*, 119 Wn.2d at 254. But courts may consult and rely on the ethical rules for reasons other than to find malpractice liability, and where they have done so, the holdings in such pre-*Hizey* cases "remain in force," including the holding in *Eriks* that violation of the rules is a question of law, not fact. *Hizey*, 119 Wn.2d at 264-65. Thus, *Hizey* preserved the propriety of using the ethical rules for reasons other than to impose malpractice liability. A trial court may properly consider the RPCs in an action by a client to recover attorney fees for the attorney's alleged breach of fiduciary duty. *Cotton v. Kronenberg*, 111

Wn. App. 258, 266, 44 P.3d 878 (2002), *review denied*, 148 Wn.2d 1011 (2003). That was done here.

¶42 Disgorgement of fees is a reasonable way to discipline specific breaches of professional responsibility, and to deter future misconduct of a similar type. "Such an order is within the inherent power of the trial court to fashion judgments." *Eriks*, 118 Wn.2d at 463. A finding of causation and damages is not required to support an order of disgorgement. *Eriks*, 118 Wn.2d at 462. Having independently decided that Ahrens violated the RPC conflict of interest rules, the trial court relied on *Eriks* and *Cotton* as authority to order Ahrens to disgorge all the fees he received for representing the Behnkes. The Behnkes had a full opportunity to present their theories and evidence of damages to the jury. The trial court did not err by limiting the remedy for the RPC violation to disgorgement.

¶43 Next, the Behnkes contend they are entitled to a new trial on damages because the court concluded, mistakenly in their view, that Ahrens' conflict of interest was waivable in view of the business experience and sophistication of the Behnkes. The Behnkes argue the trial court should have ruled the conflict was nonwaivable and instructed the jury accordingly.

¶44 This argument is misplaced. The Behnkes have not assigned error to any ruling the court made in connection with instructing the jury. The conclusion they challenge was contained in the findings and conclusions entered by the court in connection with the RPC-based claim of breach of fiduciary duty. Even if the conclusion that the conflict was waivable was erroneous, an issue on which we express no opinion, the Behnkes fail to show how it prejudiced them. Neither the jury nor the judge found a waiver.

¶45 Finally, the Behnkes contend the court erred in denying their postverdict motion for additur.

¶46 The right of trial by jury on a legal claim is inviolate. WASH. CONST. art. I, § 21. Determination of the

amount of damages is within the province of the jury, and courts are reluctant to interfere with a jury's damage award when fairly made. *Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997). The jury verdict must be upheld unless the court finds from the record that the damages are outside the range of substantial evidence in the record, shock the court's conscience, or appear to have been arrived at as the result of passion or prejudice. RCW 4.76.030; *Green v. McAllister*, 103 Wn. App. 452, 462, 14 P.3d 795 (2000). Regardless of the court's assessment of the damages, the court may not, after a fair trial, substitute its conclusions for that of the jury on the amount of damages. *Green*, 103 Wn. App. at 462. Where an award is not contrary to the evidence, this court will not find it to be the result of passion or prejudice based solely on the award amount. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 454, 191 P.3d 879 (2008). We review for an abuse of discretion. *Palmer*, 132 Wn.2d at 197.

¶47 The jury was instructed to award damages proximately caused by Ahrens' breach. The Behnkes assert that the jury failed to award "undisputed" damages for their out-of-pocket expenses for taxes, penalties, and professional fees. They ignore the issue of proximate causation, which was hotly contested at trial.

¶48 Instruction 22 stated that the verdict "should include the economic damages that you find were proximately caused by the negligence of the defendant." The verdict form asked, "What do you find to be the amount of damages proximately caused by Defendants' breach of fiduciary duty?" The jury found Ahrens breached a fiduciary duty and was negligent or committed malpractice, proximately causing damages of $6,162.25. The verdict states these damages were for fees paid to Ahrens.

¶49 The Behnkes received a good deal of advice from other professionals after forming an attorney-client relationship with Ahrens. It was not contrary to the evidence for the jury to find that Ahrens' own fee was the only damage

proximately caused to the Behnkes by Ahrens' breaches of duty. The jury could reasonably decide that the Behnkes would have bought the Heritage tax shelter even if they had known more about Ahrens' relationship with Heritage. The Behnkes point to no portion of the record evincing an attempt to inflame the jury with passion or prejudice. The trial court did not abuse its discretion by denying the Behnkes' motion for additur.

¶50 Affirmed.

GROSSE and LAU, JJ., concur.

Review denied at 177 Wn.2d 1003 (2013).