# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74978-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE MANDATORY POSTER AGENCY, | ) | |
| INC., d/b/a CORPORATE RECORDS | ) | |
| SERVICE, THE WASHINGTON LABOR | ) | |
| LAW POSTER SERVICE, | ) | |
| WASHINGTON FOOD SERVICE | ) | |
| COMPLIANCE CENTER, and STEVEN | ) | PUBLISHED OPINION |
| J. FATA, THOMAS FATA, AND | ) | |
| JOSEPH FATA, individually and in their | ) | FILED: July 3, 2017 |
| corporate capacity, | ) | |
| | ) | |
| Appellant. | ) | |

VERELLEN, C.J. — The first element of a Consumer Protection Act (CPA) violation is an unfair or deceptive act or practice.[1] An act is deceptive if it is likely to mislead a reasonable consumer. Such an act satisfies the first element if it has the capacity to deceive a substantial portion of the public. When the underlying facts are undisputed, the question whether the acts are likely to mislead–an objective inquiry–is a question of law. Whether such a deception has the capacity to reach a substantial portion of the public is a question of fact precluding summary judgment, unless the undisputed facts establish that capacity.

---

[1] Ch. 19.86 RCW.

Here, the undisputed facts show The Mandatory Poster Agency, Inc. (MPA) sent mass mailings under the assumed name Corporate Records Service (CRS) to more than 79,000 Washington corporations. As a matter of law, the undisputed format, images, and content of the mailings created a net impression likely to mislead a reasonable consumer into believing CRS is associated with a governmental agency and that the recipients were obligated to fill out and return the solicitations with a fee of $125. Notably, the mass mailings include language, tone, and imagery prohibited by MPA's 2008 "Assurance of Discontinuance," and such violations are prima facie evidence of a CPA violation.

Further, the undisputed scope of the extensive mass mailings generating payments by 2,901 consumers reveals a capacity to reach and thus deceive a substantial portion of the public. The trial court did not err in granting summary judgment that MPA engaged in a deceptive act or practice.

CRS contends the $793,540 penalty imposed by the court is excessive. On cross appeal, the State argues the penalty is too lenient. The trial court did not abuse its broad discretion in setting a penalty of $10 per mailing, together with a provision requiring CRS to fund restitution.

The trial court adequately engaged in a lodestar calculation of attorney fees, but failed to make the required findings for an award of nonlawyer time. And the trial court should not have awarded expert witness fees as costs.

Because the State is the prevailing party on appeal, it is entitled to fees on appeal.

We affirm in part and reverse in part.

2

## FACTS

Steven Fata, Thomas Fata, and Joseph Fata each own one-third of MPA and jointly undertake all corporate decisions. CRS has a mailbox in Olympia, Washington at a United Parcel Service store.

Several years ago, the Attorney General's Office initiated an investigation into MPA's mass marketing of posters summarizing state and federal legal requirements. The State alleged MPA used mailers with various business names to deceive consumers into believing they must purchase posters from the company in order to comply with state and federal law. The MPA advertisements appeared to originate from the government or an organization associated or in contact with the government. The ads also used names that evoked "an official government tone" and emblems that "mimic a state agency emblem."[2] The ads also used a postal drop box with an Olympia address. The language suggested a necessity to act, such as "Advisory," "advisement," "achieve compliance," and "effective immediately."[3]

In February 2008, at the conclusion of the Attorney General Office's investigation, MPA entered into an Assurance of Discontinuance prohibiting the company and its officers, directors, and principals from engaging in a variety of unfair or deceptive practices, including sending misleading solicitations to consumers that create the impression that the solicitations are from a government agency. The Assurance of Discontinuance also barred the use of specific terms and practices, along with the following provision:

---

[2] Clerk's Papers (CP) at 488.

[3] CP at 488.

This Assurance of Discontinuance shall not be considered an admission of violation of the Consumer Protection Act for any purposes, but failure to comply with this Assurance of Discontinuance shall be prima facie evidence of violations of RCW 19.86.020, thereby placing upon the Respondents, and their officers, directors, and principals, the burden of defending against imposition by the court of damages, injunctions, restitution, civil penalties of up to $2,000.00 per violation and costs including reasonable attorney's fees. In addition, pursuant to RCW 19.86.140[,] violations of the injunctive provisions of this Assurance of Discontinuance may result in court imposed civil penalties of up to $25,000.00.[4]

In 2012 and 2013, CRS sent "Annual Minutes Records Form" solicitations to Washington consumers. Joseph Fata designed the solicitation; Steven Fata and Thomas Fata approved its use in Washington.

CRS mailed 79,354 solicitations to Washington consumers. The front of each envelope contained the language "IMPORTANT" in bold above "Annual Minutes Requirement Statement," "TIME SENSITIVE," and "If addressed name is incorrect, please forward document to an authorized employee representative Immediately."[5] The green colored envelope included a stylized eagle symbol in the upper right-hand corner and an Olympia return address. A notation "THIS IS NOT A GOVERNMENT DOCUMENT" was located just below the return address.[6]

Inside the envelope, CRS included a form entitled "2012 – ANNUAL MINUTES RECORDS FORM."[7] The form was addressed to the recipient's business and contained a key code, bar code, response date, and the recipient's date of incorporation. Each solicitation, excluding the February 2013 mailings, also included

---

[4] CP at 492.

[5] CP at 1011, 1025, 1028.

[6] CP at 1011, 1025, 1028.

[7] CP at 1006, 1012-13, 1023-24, 1029, 2199-200.

the "Corporation Number" consisting of the uniform business identifier number assigned by the State to the corporation.[8] The first instruction on the form stated, "IMPORTANT! FOLLOW INSTRUCTIONS EXACTLY WHEN COMPLETING THIS FORM. PLEASE PRINT."[9] CRS listed selected citations to the Washington Business Corporations Act near the top of the page. The form had the disclaimer "CORPORATE RECORDS SERVICE IS NOT A GOVERNMENT AGENCY AND DOES NOT HAVE OR CONTRACT WITH ANY GOVERNMENT AGENCY TO PROVIDE THIS SERVICE."[10] This disclaimer was surrounded by other text and was located one-third of the way down from the top of the form.

CRS titled the second page "INSTRUCTIONS FOR COMPLETING THE ANNUAL MINUTES RECORDS FORM (Washington Corporations)."[11] The instructions direct recipients to review the accuracy of their preprinted corporate name and address and to then complete seven steps to fill out the form. The instructions also note that "[m]aintaining records is important to the existence of all corporations."[12] In response to the mailing, 2,901 Washington businesses submitted a completed form with the $125 fee.[13]

---

[8] CP at 2199; CP at 1010-14 (CRS did not include the corporation number in its February 2013 mailings, totaling approximately 5,619 mailings).

[9] CP at 1012-13, 1023-24, 1027, 1029, 2199.

[10] CP at 1012-13, 1023-24, 1029, 2199-200.

[11] CP at 1024.

[12] CP at 1024.

[13] CP at 484-85.

CRS sent a corporate minute book to Washington consumers who returned the Annual Minutes Records Form and $125.[14] The corporate minute book contained "Unanimous Consent of Shareholders" and "Unanimous Consent of Directors" forms.[15] The corporate minute book included instructions to sign and date the documents. It advised that "[y]our company will be in full compliance with the corporate minute records requirement after the Unanimous Consent documents are signed and dated."[16]

After receiving numerous complaints, the Attorney General's Office filed a lawsuit in King County Superior Court, alleging misrepresentation and violations of the CPA. Both parties moved for summary judgment. The trial court partially granted the State's motion and denied CRS's motion. The court concluded as a matter of law that the Annual Minutes Records Form solicitation was a deceptive act or practice that violated the Assurance of Discontinuance and the CPA. Specifically, the court determined CRS committed 79,354 separate violations by creating the deceptive net impression that its solicitations "were from a governmental agency and that Washington consumers were obligated to fill out and return the solicitations along with $125."[17] The court also concluded as a matter of law that the "solicitations had the capacity to deceive a substantial number of Washington consumers" and because CRS engaged in trade and commerce, their actions affected the public interest.

The trial court entered an order imposing a civil penalty under RCW 19.86.140 in the amount of $793,540, $10 per violation, and instituted a restitution process requiring

---

[14] CP at 1006.
[15] CP at 1015-21.
[16] CP at 1019.
[17] CP at 1591.

CRS to transmit the full amount of potential restitution, $362,625, to a claims administrator.[18] The trial court also awarded the State $337,593.20 in attorney fees and $39,571.27 in costs.[19]

CRS appeals. The State cross appeals.

## ANALYSIS

We review a summary judgment decision de novo.[20] Summary judgment is appropriate if "'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'"[21] A response to a summary judgment motion "must set forth specific facts showing that there is a genuine issue for trial."[22]

### I. Unfair or Deceptive Act

CRS argues the trial court erred by concluding as a matter of law that its solicitation was an unfair or deceptive act under the CPA.

The CPA forbids "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[23] The State must prove "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, and (3) public interest impact."[24] Unlike a private plaintiff under the CPA, the State is not required to

---

[18] CP at 2046.

[19] CP at 2125-27.

[20] Keck v. Collins, 181 Wn. App. 67, 78, 325 P.3d 306 (2014), affirmed, 184 Wn.2d 358 (2015).

[21] Id. at 78-79 (quoting CR 56(c)).

[22] CR 56(e).

[23] RCW 19.86.020.

[24] State v. Kaiser, 161 Wn. App. 705, 719, 254 P.3d 850 (2011).

prove causation or injury.[25] A CPA case brought by the State is an equitable action, and there is no jury trial.[26]

The "unfair or deceptive act" element can be established in one of three ways: (i) per se unfair or deceptive conduct,[27] (ii) an act that has the capacity to deceive a substantial portion of the public,[28] or (iii) an unfair or deceptive act or practice not regulated by statute but in violation of the public interest.[29] A plaintiff does not need to show the act was intended to deceive, "only that it had the capacity to deceive a substantial portion of the public."[30] "'Deception exists "if there is a representation, omission, or practice that is likely to mislead" a reasonable consumer.'"[31] The CPA does not define "deceptive," but "the implicit understanding is that 'the actor *misrepresented* something of material importance.'"[32] A deceptive act or practice is measured by "the net impression" on a reasonable consumer.[33]

---

[25] Id.

[26] RCW 19.86.080; State ex rel. Dep't of Ecology v. Anderson, 94 Wn.2d 727, 730, 620 P.2d 76 (1980).

[27] Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 785, 295 P.3d 1179 (2013).

[28] Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784, 719 P.2d 531 (1986); Behnke v. Ahrens, 172 Wn. App. 281, 290-92, 294 P.3d 729 (2012).

[29] Klem, 176 Wn.2d at 787; Panag v. Farmers Ins. Co., 166 Wn.2d 27, 37 n.3, 204 P.3d 885 (2009).

[30] Panag, 166 Wn.2d at 47.

[31] Rush v. Blackburn, 190 Wn. App. 945, 963, 361 P.3d 217 (2015) (quoting id. at 50).

[32] Kaiser, 161 Wn. App. at 719 (quoting Hiner v. Bridgestone/Firestone, Inc., 91 Wn. App. 722, 730, 959 P.2d 1158 (1998), rev'd on other grounds, 138 Wn.2d 248, 978 P.2d 505 (1999)).

[33] Panag, 166 Wn.2d at 50 (quoting Fed. Trade Comm'n v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006)).

The parties dispute whether the first element of a CPA claim presents a question of law or question of fact. Several cases have recognized the first element is a question of law when the facts are undisputed.

In Leingang v. Pierce County Medical Bureau, Inc., the court noted:

> Whether a party in fact committed a particular act is reviewable under the substantial evidence test. However, the determination of whether a particular statute applies to a factual situation is a conclusion of law. Consequently, whether a particular action gives rise to a Consumer Protection Act violation is reviewable as a question of law. *Therefore, since there is no dispute of facts as to what the parties did in this case, whether the conduct constitutes an unfair or deceptive act can be decided by this court as a question of law*.[34]

Twelve years later, our Supreme Court echoed the same standard in Panag v. Farmers Insurance Company of Washington: "The next issue is whether . . . the first [CPA] element has been established. Whether a particular act or practice is 'unfair or deceptive' *is a question of law*."[35] We have recognized this standard in several cases.[36]

---

[34] 131 Wn.2d 133, 150, 930 P.2d 288 (1997) (emphasis added) (citations omitted).

[35] 166 Wn.2d 27, 47, 204 P.3d 885 (2009) (emphasis added) (citing Leingang, 131 Wn.2d at 150).

[36] Rush, 190 Wn. App. at 963-64 ("'Whether undisputed conduct is unfair or deceptive is a question of law, not a question of fact.'") (quoting Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 786, 336 P.3d 1142 (2014)); Holiday Resort Cmty. Ass'n v. Echo Lake Assocs., LLC, 134 Wn. App. 210, 226, 135 P.3d 499 (2006) ("Whether an alleged act is unfair or deceptive is a question of law.") (citing Leingang, 131 Wn.2d at 150); Kaiser, 161 Wn. App. at 719 (citing Leingang, 131 Wn.2d at 150); Stephens v. Omni Ins. Co., 138 Wn. App. 151, 166, 159 P.3d 10 (2007) (citing Leingang, 131 Wn.2d at 150); Bavand v. OneWest Bank, 196 Wn. App. 813, 840, 385 P.3d 233 (2016) (citing Leingang, 131 Wn.2d at 150); Keyes v. Bollinger, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982); Barkley v. GreenPoint Mortg. Funding, Inc., 190 Wn. App. 58, 68, 358 P.3d 1204 (2015) (citing Leingang, 131 Wn.2d at 150); Walker v. Quality Loan Serv. Corp., 176 Wn. App. 294, 318, 308 P.3d 716 (2013); Wellman & Zuck, Inc. v. Hartford Fire Ins. Co., 170 Wn. App. 666, 678, 285 P.3d 892 (2012); Brown ex rel. Richards v. Brown, 157 Wn. App. 803, 815, 239 P.3d 602 (2010); Carlile v. Harbour Homes, Inc., 147 Wn. App. 193, 211, 194 P.3d 280 (2008) (citing Leingang, 131 Wn.2d at 150); Shields v. Morgan Financial, Inc., 130 Wn. App. 750, 755, 125 P.3d 164 (2005); Shah v. Allstate

CRS points to Behnke v. Ahrens[37] and Holiday Resort Community Association v. Echo Lake Associates, LLC[38] for the proposition that a question of fact may exist. But those cases hold that the capacity to reach a substantial portion of the public may present a question of fact, *not* that the fact finder is asked to determine whether undisputed facts are likely to mislead a reasonable consumer.[39]

The Holiday Resort court acknowledged that whether an act is unfair or deceptive is a legal question, but "whether the 1997 Rental Agreement has the capacity to deceive a substantial portion of the public is a question of fact."[40] In that case, the trial court dismissed the plaintiffs' suit and ruled there was no connection between the alleged CPA violation and the plaintiffs' injuries.[41] On appeal, this court concluded the language in the rental agreement violated a statute and was an unfair act or practice

---

Ins. Co., 130 Wn. App. 74, 86, 121 P.3d 1204 (2005); Robinson v. Avis Rent A Car System, Inc., 106 Wn. App. 104, 114, 22 P.3d 818 (2001) (citing Leingang, 131 Wn.2d at 150); Dwyer v. J.I. Kislak Mortg. Corp., 103 Wn. App. 542, 546, 13 P.3d 240 (2000) (citing Leingang, 131 Wn.2d at 150); Griffith v. Centex Real Estate Corp., 93 Wn. App. 202, 214, 969 P.2d 486 (1998) (citing Leingang, 131 Wn.2d at 150); Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wn. App. 553, 560, 825 P.2d 714 (1992).

[37] 172 Wn. App. 281, 294 P.3d 729 (2012).

[38] 134 Wn. App. 210, 135 P.3d 499 (2006)

[39] The comments to the pattern jury instruction are consistent with this interpretation: "Whether an act has the capacity to deceive a substantial portion of the public is a question of fact. If the facts about a party's act or practice are not in dispute, the trial court may decide whether that act or practice was deceptive as a matter of law." 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 310.08, at 43 (6th ed. Supp. 2013) (citing Behnke, 172 Wn. App. at 281; Leingang, 131 Wn.2d at 149-50).

[40] Holiday Resort, 134 Wn. App. at 226-27.

[41] Id. at 217-18.

under the CPA as a matter of law.[42] But it also noted that whether that act "has the capacity to deceive a substantial portion of the public is a question of fact," reasoning:

> Here, the tenants allege the language in the 1997 Rental Agreement not only misstates the law but also has the capacity to deceive a portion of the public *because it is available for dissemination* to the more than 500 [Manufactured Housing Communities of Washington] members who are mobile home park owners or managers.[43]

In Behnke, citing Holiday Resort, this court also recognized "[w]hether a deceptive act has the capacity to deceive a substantial portion of the public is a question of fact."[44] This court specifically emphasized, "In applying the requirement that the allegedly deceptive act has the capacity to deceive 'a substantial portion of the public,' the concern of Washington courts has been to rule out those deceptive acts and practices that are unique to the relationship between plaintiff and defendant."[45] We also recognized that "[t]he definition of 'unfair' and 'deceptive' must be objective to prevent every consumer complaint from becoming a triable violation of the act."[46]

CRS's reliance on Holiday Resort and Behnke is misplaced. Those cases recognize only that the substantial portion of the public component of a deceptive act or practice may present a question of fact, not that a fact finder weighs whether a representation, omission, or practice is likely to mislead a reasonable consumer.[47]

_____

[42] Id. at 226.

[43] Id. at 226-27 (emphasis added).

[44] Behnke, 172 Wn. App. at 292 (citing id.).

[45] Id. at 292-93.

[46] Id. at 293.

[47] Additionally, Behnke cites Holiday Resort, which in turn cites Hangman Ridge, 105 Wn.2d at 789-90, where our Supreme Court held only that the separate public interest element is a question of fact. CRS also cites Deegan v. Windermere Real Estate/Center-Isle, Inc., 197 Wn. App. 875, 391 P.3d 582 (2017) and Rhodes v. Rains,

The undisputed facts show each of the 79,354 solicitations included an envelope that (1) contained bolded text reading, "IMPORTANT" "Annual Minutes Requirement Statement"; (2) depicted a large eagle on the top right side of the green colored envelope; (3) stated "Business Mail - Time Sensitive"; (4) directed the recipient to "[p]lease forward to an authorized employee representative Immediately"; and (5) used authoritative language similar to a government document.[48] The solicitation inside the envelope (1) contained selective citations to Washington corporate statutes, (2) directed "IMPORTANT! FOLLOW INSTRUCTIONS EXACTLY WHEN COMPLETING THIS FORM, PLEASE PRINT," (3) referred to the recipient's Washington State corporation uniform business identifier number, and (4) recited the recipient's incorporation date.[49] Although the CRS form is not identical to the Secretary of State's annual report form, the tone is similar to a mandatory governmental form.

The CRS mass mailings are likely to mislead a reasonable consumer because the undisputed format, images, and content do mimic government-related forms and create the net impression that the recipient is obligated to return the form and pay $125 to CRS. CRS contends its solicitations were not deceptive because they accurately stated Washington corporate law requirements. But "[e]ven accurate information may be deceptive 'if there is a representation, omission or practice that is likely to

---

195 Wn. App. 235, 381 P.3d 58 (2016), but neither case affects the outcome of this matter. Deegan stands for the proposition that causation under the CPA is a question of fact, and Rhodes merely suggests that disputed facts should be resolved by the trier of fact.

[48] CP at 1011, 1025, 1028.

[49] CP at 1012-13, 1023-24, 1027, 1029, 2199.

mislead.'"[50] Here, it is clear that consents in lieu of director and shareholder meetings may satisfy Washington annual meeting and recordkeeping requirements. But the accuracy of those statements does not eliminate their likelihood to mislead in the context of the annual minutes solicitation. Consumers are likely misled by the net impression that CRS is associated with the government and that consumers are required to return the completed form with a fee.

CRS also focuses on its disclaimers, but courts have recognized that disclaimers do not always cure the potential for deception.[51] Here, the disclaimer "THIS IS NOT A GOVERNMENT DOCUMENT" is just underneath the return address on the envelope and is overshadowed by a large all caps and bold "IMPORTANT" notation on the face of the envelope just above "Annual Minutes Requirement Statement." The all-caps disclaimer in the instructions, that CRS is not a government agency and does not have a contract with a government agency is one-third down the page surrounded by unrelated instructions. Considering the format and placement, the disclaimers do not cure the potential for deception. Notwithstanding the disclaimers, CRS's solicitation created the misleading net impression that CRS is associated with a government agency and that consumers were obligated to return the form with a fee.

---

[50] Kaiser, 161 Wn. App. at 719 (internal quotation marks omitted) (quoting Panag, 166 Wn.2d at 50).

[51] Panag, 166 Wn.2d at 50; Cyberspace.Com, 453 F.3d at 1200 (solicitation masquerading as a rebate check was misleading notwithstanding fine print notices accurately disclosing its true nature); Floersheim v. Fed. Trade Comm'n, 411 F.2d 874, 876 (9th Cir.1969) (disclaimer did not cure deceptive impression that demand letter was issued by United States government, as many individuals "would be unlikely to notice respondent's inconspicuous disclaimer or understand its import"); Indep. Dir. Corp. v. Fed. Trade Comm'n, 188 F.2d 468 (2d Cir.1951) (solicitation disguised as renewal notice deceptive notwithstanding fine print disclosures).

Additionally, because there is no dispute that the mass mailing was sent to over 79,000 consumers, generating 2,901 paid responses, there is no question of fact whether the misleading mailings reached, and thus had the capacity to deceive, a substantial portion of the public.

There is no issue of material fact for the trier of fact to decide.

Further, contrary to CRS's contentions, the mailings violated the Assurance of Discontinuance and are prima facie evidence of deceptive acts. The Assurance of Discontinuance precluded "[u]se of the term 'confidential', 'important information', 'approved', 'effective immediately', 'compliance', 'issued', or *any terms of similar import*."[52] CRS used the words "IMPORTANT" and "Requirement" on its envelope and instructed recipients "IMPORTANT! FOLLOW INSTRUCTIONS EXACTLY WHEN COMPLETING THIS FORM."[53]

The Assurance of Discontinuance barred language suggesting that "an enclosed solicitation requires immediate or other mandated response."[54] CRS used "Annual Minutes Requirement Statement," "If addressed name is incorrect, please forward document to an authorized employee representative Immediately," and "TIME SENSITIVE" on the envelope.[55] CRS also referred to a corporate uniform business identifier number on the vast majority of the solicitations.[56]

---

[52] CP at 489, Assurance of Discontinuance (AOD) 2.1(b)(3) (emphasis added).
[53] CP at 1011-12, 1028-29.
[54] CP at 489, AOD 2.1(b)(5).
[55] CP at 1011, 1028.
[56] CP at 1029.

We conclude CRS's mailers violated the Assurance of Discontinuance. The violations are prima facie evidence of a CPA violation.

## II. Penalties

CRS argues the trial court abused its discretion in imposing an excessive penalty because the State did not prove each recipient was deceived by the solicitation. In its cross appeal, the State contends the penalties were too lenient.

The CPA includes specific provisions for civil penalties, authorizing a penalty up to $2,000 per violation.[57] We review the trial court's assessment of civil penalties within the statutory limits for an abuse of discretion.[58] Each deceptive act is a separate violation. In State v. Ralph Williams' North West Chrysler Plymouth, Inc., our Supreme Court recognized that the CPA "vests the trial court with the power to assess a penalty for each violation."[59] And CPA penalties are valid even though "the trial court did not find that the consumers relied on appellants' wrongful conduct."[60] Similarly, because each of CRS's 79,354 solicitations had the capacity to deceive, each mailing was a violation, whether or not the recipient purchased its product.

---

[57] RCW 19.86.140.

[58] See Ethridge v. Hwang, 105 Wn. App. 447, 459, 20 P.3d 958 (2001) (award of enhanced damages under the CPA reviewed for abuse of discretion); United States v. ITT Continental Baking Co., 420 U.S. 223, 229 n.6, 95 S. Ct. 926, 43 L. Ed. 2d 148 (1975) (reviewing lower court assessment of civil penalty within statutory limits for Federal Trade Commission Act violation for abuse of discretion); see also Progressive Animal Welfare Soc'y v. University of Wash., 114 Wn.2d 677, 683-84, 688-89, 790 P.2d 604 (1990) (reviewing trial court's calculation of attorney fees mandated by statute for abuse of discretion).

[59] 87 Wn.2d 298, 317, 553 P.2d 423 (1976) (also recognizing the potential for multiple violations per consumer).

[60] Id.

Both parties cite <u>United States v. Reader's Digest Association Inc.</u>, a similar mass mailing case under an analogous consumer protection standard, where a federal district court held that Reader's Digest committed 17,940,521 violations on the rationale that "each letter distributed in the Digest's mass mailings constituted a separate violation."[61] The United States Court of Appeals for the Third Circuit affirmed, holding "*each letter* included as part of a mass mailing constitutes a separate violation."[62] The court also identified five factors to consider in determining the appropriate penalty: (1) whether defendants acted in good faith, (2) injury to the public, (3) defendant's ability to pay, (4) desire to eliminate any benefits derived by the defendants from the violation at issue, and (5) necessity of vindicating the authority of the law enforcement agency.[63]

Here, the trial court focused on lack of good faith without addressing the other <u>Reader's Digest</u> factors. While the factors are helpful guidelines, we reject any suggestion by either party that a trial court is compelled to expressly address each factor.

Next, CRS argues RCW 19.86.140 limits the total civil penalty to $25,000. RCW 19.86.140 provides, in relevant part:

> Every person who shall violate the terms of any injunction issued as in this chapter provided, shall forfeit and pay a civil penalty of not more than twenty-five thousand dollars.
>
> . . . .
>
> Every person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more than two thousand dollars for each violation.

---

[61] 662 F.2d 955, 959-60 (3rd Cir. 1981).

[62] <u>Id.</u> at 966 (emphasis added).

[63] <u>Id.</u> at 967.

The $25,000.00 limit from the first paragraph does not apply here because the State did not plead or seek to enforce the Assurance of Discontinuance injunctive provisions. Instead, the State pleaded relief for violations of RCW 19.86.020 for deceptive acts. The trial court determined that the violations of the assurance of discontinuance constituted prima facie evidence of such CPA violations.

Relying on BMW of North America, Inc. v. Gore, CRS also argues this civil penalty violates due process.[64] To determine whether a $2,000,000 punitive damages award to one plaintiff in Gore violated due process, the United States Supreme Court looked to the reprehensibility of the defendant's conduct by considering specific factors.[65] But in Perez-Farias v. Global Horizons, Inc., our Supreme Court expressly declined to apply the Gore factors to cases involving statutory damages, noting "no state public policy or due process principles require reduction in the total damages mandated by statute."[66] And CRS does not provide any compelling authority[67] that courts have applied the Gore factors to cases involving statutory damages.[68]

---

[64] 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996).

[65] The court in Gore looked at whether the harm caused was physical or economic, the conduct showed an indifference to or a reckless disregard of the health or safety of others, the target of the conduct had financial vulnerability, the conduct involved repeated actions or was an isolated incident, and if the harm was the result of intentional malice, trickery, or deceit. Id. at 575.

[66] 175 Wn.2d 518, 533-34, 286 P.3d 46 (2012).

[67] CRS cites to State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d. 585 (2003), but that case makes no mention of the applicability of the Gore factors to cases involving statutory damages.

[68] Although the State offers analysis as to how, if considered, the Gore factors would apply in this case, we need not apply those factors. See Perez-Farias, 175 Wn.2d at 532 n.15.

17

On cross appeal, the State argues the trial court did not impose penalties adequate to deter future violations, but does not establish that the trial court's decision was outside the range of acceptable choices. The trial court specifically noted the acceptable range of penalties in its order:

> The civil penalty set herein is less than the maximum potential civil penalty of $2,000 per violation, which would total $158,708,000. There is no mandatory "cap" on the penalty in this situation. The amount is also less than the potential harm of $9,919,250 that Defendants could have caused if all Washington consumers who had received Defendants' deceptive mailer had purchased the $125 product based on Defendants' deception.[69]

The penalties, combined with the restitution provisions, ensure compensation to injured consumers and, considering the likely response rate for such mass-mail solicitations, far exceed any potential profits. The penalty does deter similar misleading mailings.

We conclude the trial court did not abuse its discretion in setting the amount of penalties.

### III. Fees

CRS argues the trial court abused its discretion in calculating and awarding the State a fee award in the amount of $337,593.20.

In a CPA enforcement action, the trial court has discretion to award the prevailing party the costs of the action, including reasonable attorney fees.[70] To determine a reasonable attorney fee, the court starts with the "lodestar" calculation.[71] That

---

[69] CP at 2045.

[70] RCW 19.86.080(1); Ralph Williams, 87 Wn.2d at 314-15.

[71] Berryman v. Metcalf, 177 Wn. App. 644, 660, 312 P.3d 745 (2013).

calculation includes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[72]

Here, the trial court engaged in the lodestar analysis and found that the hourly rates of the attorneys were reasonable. CRS argues that the requested government attorney rates are artificially high, but it was within the discretion of the trial court to accept the identified rates.[73] The trial court also concluded that the time detailed in the State's declarations was reasonable and appropriate. The State submitted a 28-page spreadsheet listing the individual time entries for which it sought fees. As CRS notes, several entries are vague and general. But the majority of the entries contain information identifying the nature of the work itemized. The trial court did not abuse its discretion in accepting the itemizations.

CRS argues the State failed to segregate its time spent on its abandoned theory that CRS misrepresented the legal standards for Washington corporate recordkeeping. The time itemized for a case should be discounted for hours spent on unsuccessful claims or otherwise unproductive time.[74] A reduction is warranted if "the hours at issue were unproductive or that they were not sufficiently related to the successful claim."[75]

---

[72] Id.

[73] See W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick, 39 Wn. App. 466, 474-75, 694 P.2d 1101 (1985) (allowing fees for city attorney); Metro. Mortg. & Secs. Co., Inc. v. Becker, 64 Wn. App. 626, 632-33, 825 P.2d 360 (1992) (reasonable hourly rate for in-house counsel not limited to actual salary). We note that in the absence of any specific objection to the hourly rates, the record before us is not well developed regarding the basis for a challenge on appeal to the reasonableness of those rates.

[74] Berryman, 177 Wn. App. at 662 (quoting Bowers, 100 Wn.2d at 597).

[75] Pham v. Seattle City Light, 159 Wn.2d 527, 539, 151 P.3d 976 (2007).

The trial judge "is in the best position to determine which hours should be included in the lodestar calculation."[76]

Here, the question of segregation was squarely presented to the trial court. CRS argued a segregation was necessary for time spent by the State on its allegation that CRS inaccurately stated Washington corporate recordkeeping standards. Specifically, CRS pointed to the June 18, 2015 letter by the assistant attorney general as evidence the State abandoned that theory late in the litigation. The State replied:

> While the focus of the case has been on whether Defendants' solicitation created the deceptive net impression that the solicitation came from a government agency that consumers were required to return and whether Defendants violated the 2008 Assurance of Discontinuance (AOD), Defendants also engaged in deceptive acts and practices by offering to provide meeting minutes while actually providing corporate consents.[77]

The June 18 letter is largely consistent with the State's argument.[78] Although the State may have refined its theory of a corporate recordkeeping misrepresentation and the trial court granted summary judgment only on the "net impressions" theory, both alleged unfair and deceptive acts based on the same core of underlying facts of the contents of the mass mailings. Where the plaintiffs' claims involve a common core of facts and related legal theories, "'a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the [trial] court did not adopt each contention

---

[76] Id. at 540.

[77] CP at 2111.

[78] The letter purports to clarify the State's legal theories and then reconcile its clarified position with an earlier interrogatory answer: "[I]t is our position that the Washington Business Corporation Act requires a corporation to take certain actions through a meeting or through executed consents. If a meeting is held, then minutes must be kept as permanent records. If a meeting is not held, and corporate actions are approved through executed consents, there is no requirement to prepare annual minutes. . . . We believe the State's response to Interrogatory No. 13 is consistent with the State's Causes of Action as plead." CP at 2088, 2090.

raised.'"[79] The trial court did not abuse its discretion in declining to require a segregation.

We conclude the trial court did not abuse its discretion in awarding $310,422.40 for the work performed by the State's four attorneys.

CRS also contends the trial court abused its discretion when it awarded fees for the State's paralegal and investigator.

For the recovery of fees of nonlawyers, the court must consider six factors identified in Absher Construction Co. v. Kent School District.[80] The State's declarations regarding the work of its investigator and paralegal do not specify how the services performed were legal in nature, whether they were supervised by an attorney, the qualifications of the person performing the work, or the reasonable community standards for the nature of work. CRS adequately raised the need to document requested fees. The trial court failed to address the governing factors.

We conclude the trial court abused its discretion when it included $10,405.80 for paralegal time and $16,764.90 for investigator time in the State's attorney fee award.

---

[79] Martinez v. City of Tacoma, 81 Wn. App. 228, 243, 914 P.2d 86 (1996) (quoting Hensley v. Eckerhart, 461 U.S. 424, 440, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)).

[80] 79 Wn. App. 841, 845, 917 P.2d 1086 (1996) ("(1) the services performed by the nonlawyer personnel must be legal in nature; (2) the performance of these services must be supervised by an attorney; (3) the qualifications of the person performing the services must be specified in the request for fees in sufficient detail to demonstrate that the person is qualified by virtue of education, training, or work experience to perform substantive legal work; (4) the nature of the services performed must be specified in the request for fees in order to allow the reviewing court to determine that the services performed were legal rather than clerical; (5) as with attorney time, the amount of time expended must be set forth and must be reasonable; and (6) the amount charged must reflect reasonable community standards for charges by that category of personnel.").

### IV. Costs

CRS argues the trial court erred in awarding costs beyond those allowed in RCW 4.84.010.

The standard of review for an award of costs involves a two-step process.[81] First, whether a statute, contract, or equitable theory authorizes the award is a matter of law, which we review de novo.[82] Second, if there is such authority, the amount of the award is subject to the abuse of discretion standard.[83]

Costs in a CPA action are limited to those set out in RCW 4.84.010.[84] RCW 4.84.010 does not authorize expert witness fees in an award of costs to the prevailing party.[85] Our Supreme Court has recognized that "'[w]here an expert is employed and is acting for one of the parties, it is not proper to charge the allowance of fees for such expert against the losing party as a part of the costs of the action.'"[86]

Here, the State included expert witness fees and the transcription of that expert witness testimony in its cost bill.

We conclude the trial court erred in awarding costs for expert witness fees and the transcription of that testimony.

---

[81] Estep v. Hamilton, 148 Wn. App. 246, 259, 201 P.3d 331 (2008).

[82] Id.

[83] Id.

[84] Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 693-94, 132 P.3d 115 (2006).

[85] Estep, 148 Wn. App. at 263.

[86] Id. (alteration in original) (quoting Fiorito v. Goerig, 27 Wn.2d 615, 620, 179 P.2d 316 (1974)).

### V. Fees on Appeal

The State requests fees and costs on appeal.

The prevailing party is entitled to attorney fees and costs on appeal if applicable law grants to a party the right to recover and that party includes such a request in its opening brief.[87] Under RCW 19.86.080(1), this court has discretion to award the prevailing party reasonable attorney fees and costs.[88]

We conclude, upon compliance with RAP 18.1, the State is entitled to an award of reasonable attorney fees and costs.

### CONCLUSION

We reverse the portion of the fee award as it pertains to work performed by the two nonlawyers and the award of costs relating to expert witness fees and transcription of expert testimony. As to all other issues, we affirm the trial court.

Cox, J.

WE CONCUR:

Mann, J.

---

[87] RAP 18.1.

[88] Kaiser, 161 Wn. App. at 726.