[Nos. 63111-0-I; 63616-2-I.   Division One.   March 21, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH M. KAISER ET AL., *Appellants.*

706

*Joseph M. Kaiser* and *Heidi M. Kaiser*, pro se.

*Robert M. McKenna, Attorney General*, and *James T. Sugarman* and *Jason E. Bernstein, Assistants*, for respondent.

¶1 SCHINDLER, J. — Joseph Kaiser, doing business as G. Hobus Investments LLC, Bobo Buys Real Estate LLC, Pre Flop LLC, and Unclaimed Funds Inc. (collectively Kaiser), preyed on property owners facing a tax foreclosure by falsely offering to help save the property from foreclosure if the owner agreed to enter into an agreement giving Kaiser an ownership interest in the property. The attorney general on behalf of the State of Washington filed an enforcement action against Kaiser alleging violation of the Consumer Protection Act (CPA), chapter 19.86 RCW, and seeking declaratory and injunctive relief. Kaiser appeals the decision on partial summary judgment that as a matter of law he violated the CPA by soliciting property owners facing tax foreclosure with false promises to help save their property

or home, inducing property owners to enter into unconscionable and unfair agreements giving Kaiser ownership or control of their property, intercepting tax funds that should have been paid to the property owners, using a power of attorney and retaining attorneys to collect tax overage funds, acting as both a trustee and beneficiary in land trust deals, and falsely soliciting and inducing former property owners to enter into agreements to obtain restitution funds. Kaiser also claims the trial court erred in allowing testimony contradicting the terms of the agreements entered into by the homeowners, in concluding that the partial interest deal agreements violated the CPA, and in failing to address whether four other real estate transactions affect the public interest in violation of the CPA. We reject Kaiser's arguments on appeal and affirm the partial summary judgment order, the trial court's findings of fact and conclusions of law, and entry of the injunctive relief order.

## FACTS

¶2  The facts are not in dispute. Between 1998 and 2008, Joseph Kaiser and his partners, Walter Scamehorn, Arliss Morgan, and Tina Worthey, doing business as Fiscal Dynamics Inc., Cumulative LLC, Dove Realty Inc., Northwest Assets Inc., G. Hobus Investments, Bobo Buys Real Estate, and Pre Flop engaged in approximately 400 transactions with property owners facing tax foreclosure.

*Solicitations*

¶3  Kaiser and his partners sent thousands of letters and postcards to property owners who had received a certificate of tax delinquency. The solicitations offered to act on the owner's behalf to "help them keep their property" or "keep their home," and falsely claimed that they had successfully prevented foreclosure.

¶4  For example, in the "Equalizer" letter, Kaiser falsely claims that he will act on the owner's behalf, carefully explain the available options, and help "stop foreclosure and

save your property."[1] Another series of letters describes his partner Tina Worthey as "Wonder Woman" and falsely claims she will act on the property owner's behalf to get them out of trouble because she lost her own home in foreclosure and was "an experienced foreclosure professional."

¶5  The "Missed Opportunity," "Can You Believe It" solicitations and "Why This Postcard?" also falsely claim that Kaiser and his partners will "help the owner keep their home" and prevent foreclosure "like it never happened in the first place," and they "will help owners by fixing real estate problems and figure out solutions to their unpaid taxes." Kaiser also sent hundreds of postcards suggesting that Kaiser and his partners are "in the business of assisting" property owners and warns that other investors will come "knocking on your door *trying to steal your property.*"

¶6  If a property owner contacted Kaiser or his partners in response to the solicitations, the property owner was induced to enter into one of two transactions that Kaiser referred to as an "overage play" agreement, or a "partial interest deal" or "partnering up" agreement.

Overage Play Scheme

¶7  When a property owner does not pay taxes the county issues a certificate of delinquency to the record property owner. If the taxes remain unpaid, the county proceeds with a tax foreclosure sale. After deducting the delinquent taxes and fees from the sale, the remaining or "overage" amount is paid to the record owner at the time the certificate of delinquency was issued.

¶8  In the overage play scheme, Kaiser offers to help the property owner avoid foreclosure. Kaiser typically pays the property owners $100 to $500 and induces the owner to enter into an agreement that gives Kaiser title to the

---

[1] The "Equalizer" apparently refers to a popular television show where the hero helps solve problems of people in distress. Kaiser referred to himself in these publications as "The Real Estate Equalizer."

property.[2] Kaiser does not tell the property owners that he intends to allow the tax sale to go forward.

¶9 As part of the overage play agreement, a property owner signs a number of documents, including (1) a purchase and sale agreement, (2) a quitclaim deed, (3) a seller acknowledgement, and (4) a power of attorney to Kaiser. After obtaining title to the property, instead of taking steps to avoid foreclosure, Kaiser allowed the property to go to a tax sale and either kept the entire overage amount or a percentage of the overage.

¶10 In response to several lawsuits challenging Kaiser's right to receive the overage amount after the tax sale, Kaiser continuously updated and added to the forms that he and his partners used in the overage play transactions in order to remove any contractual defenses and prevent the courts from "unwind[ing]" his transactions. For example, on the seller acknowledgement form, Kaiser had the property owner agree that the transaction was "Not A Loan," "Fully Informed," and "Not Under Duress." Kaiser also later added an "Agreement to Irrevocably Assign Overage Funds" to him.

¶11 There is no dispute that Kaiser was not the record owner of the property when the county issued the certificate of delinquency. Therefore, in order to collect the overage, Kaiser had the owner sign a notarized form that allowed him to obtain a power of attorney. Using the power of attorney, Kaiser was able to apply for the overage on behalf of the record owner. Kaiser also retained lawyers to represent the record owners. The lawyers would apply for the overage funds on behalf of the owner. But based on the agreement between the property owners and Kaiser, the attorney would pay Kaiser the overage funds.

¶12 Overages 10 times greater than Kaiser's purchase price were normal. Kaiser's partner Scamehorn estimated that 50 to 80 percent of the overage play transactions

---

[2] Most overage plays involved undeveloped parcels of land not encumbered by a mortgage.

generated overages greater than $5,000 at the tax sale, with only 10 to 20 percent not generating any overage. Kaiser admits that if the property owners knew about the overage, they would never agree to allow him to collect it. Accordingly, Kaiser never fully explained the overage addendum to the property owners and any disclosure about the overage is buried in other contractual boilerplate.

¶13 In one example of an overage play transaction, Michael and Patty Radvick contacted Kaiser to help them avoid the tax sale and keep their property. Kaiser paid the Radvicks $500 and the Radvicks agreed to enter into a purchase and sale agreement and execute a quitclaim deed to Kaiser. Kaiser did not pay the delinquent taxes as promised; instead, he let the tax sale proceed. After deducting unpaid taxes and fees, the sale generated an overage of $37,994. Kaiser used the quitclaim deed signed by the Radvicks to collect the overage funds.

¶14 In another example, four days before the scheduled tax sale Borden and Edna Sagmoen entered into an agreement with Kaiser in order to keep their property. The Sagmoens owed $3,846 in unpaid taxes. Kaiser paid the Sagmoens $200 and the Sagmoens signed an agreement giving Kaiser a limited power of attorney. Kaiser allowed the tax sale to proceed. The property sold for $20,500 and generated an overage of $16,655. Kaiser collected the overage using the limited power of attorney signed by the Sagmoens.

¶15 In a variation of the overage play scheme, Kaiser sometimes split the overage with the property owner in a "participation overage play." In a participation overage play agreement, any overage generated at the tax sale is first used to refund Kaiser's purchase price and attorneys fees, and then Kaiser can collect over 70 percent of the remaining funds. For example, Kaiser paid Phyllis Cunningham $200 to enter into an agreement. That entitled Kaiser to 80 percent of the overage. If Cunningham breached the agreement, damages were set at $100 per day until Kaiser received his money. After the tax auction, an attorney hired

by Kaiser applied for the overage of $8,048. The attorney refunded Kaiser his $200, recovered his attorney fee of $500, deducted Kaiser's share of $5,878, and then paid Cunningham the remaining $1,470.

### Partial Interest Deals

¶16 In partial interest deals, or what Kaiser describes as "partnering up," Kaiser induces a homeowner facing tax foreclosure to place the property in a trust and designate Kaiser "through his business entities" as the trustee and cobeneficiary. The partial interest agreements allow Kaiser to have the exclusive power over the sale of the home. After obtaining title and control over the property, Kaiser pays the delinquent property taxes. Kaiser used the limited power of attorney obtained from the homeowners in partial interest deals to falsify mandatory tax affidavits to avoid paying excise taxes on the property transaction.

¶17 As part of a partial interest deal agreement, the homeowner signs (1) an irrevocable warranty deed conveying the property to Kaiser as trustee, (2) an irrevocable agreement assigning 25 to 50 percent of the homeowner's interest to Kaiser as a beneficiary, (3) a land trust agreement, (4) an agreement providing that the home will be sold within 12 to 36 months and that the homeowner will pay Kaiser rent according to the agreement or the homeowner's interest is irrevocably terminated, (5) a form giving Kaiser limited power of attorney over the home, (6) a month to month lease that is terminable at will, as well as (7) a number of disclaimers and exculpatory agreements.

¶18 Kaiser and his partners only minimally and vaguely described the agreement in misleading terms, saying, "[W]e will pay the property taxes and then be 50/50 partners," or suggesting that people repay by refinancing or selling the home and then splitting the proceeds with Kaiser. Kaiser never told the homeowners that he controls whether to sell the home, how much to sell the property for, and that he has no obligation to sell the home back to the homeowners. The partial interest deal agreements contain many complex and

contradictory forms. Kaiser admits that he does not typically provide copies of the documents the homeowners signed.

¶19 As described by Kaiser, "in any such deal we're looking for opportunity to swoop in and save the day, thereby forcing the thing to the breaking point and getting the property liquidated at the earliest possible opportunity." While the partial interest deal agreements give the homeowner the right to some percentage of the sales proceeds and the right to live in the house and pay rent for one to three years, the rights are illusory. There is no dispute that the "two rights are tenuous because the documents contain hair-trigger default provisions which void these rights if the former homeowner is even five days late on a rental payment or violates any of the other terms contained in the numerous documents Mr. Kaiser has them sign."

¶20 Kaiser admits that "he maintains all control over the possible re-sale of the home, deciding when it is sold, to whom it is sold, and for how much." Kaiser testified that "every partial interest deal he has created is actually in default. . . . Therefore, none of the former homeowners maintains their right to possession of the property or a percentage of the proceeds if Kaiser chooses to sell it." Kaiser has also never sold a property back to a former homeowner.

¶21 In one example of a partial interest deal, Kaiser offered to pay the delinquent taxes of $7,075 owing on Steven Reynolds' home and to pay him $2,000 in return for 25 percent interest in his home that he said was worth over $160,000. Reynolds said that he thought he had obtained a loan from Kaiser, and Kaiser never explained that Reynolds was giving Kaiser title and control of the property. Even though Reynolds said that he later paid Kaiser $24,000, he was unable to regain his home. In another example, Kaiser agreed to pay the $11,189 in delinquent taxes owing in return for a 30 percent interest in Randy Darling's home. At the time, Darling's home was assessed at $172,000.

*Enforcement Action*

¶22 On March 14, 2007, the attorney general on behalf of the State of Washington filed a complaint for a declaratory judgment and injunctive and other relief against Kaiser and his partners, Scamehorn, Morgan, and Worthey, doing business as Fiscal Dynamics, Cumulative, Dove Realty, Northwest Assets, G. Hobus Investments, Bobo Buys Real Estate, and Pre Flop. The complaint alleged the defendants committed unfair and deceptive acts and practices in violation of the CPA by soliciting property owners facing tax foreclosure and falsely offering to help the property owners avoid a tax foreclosure sale and keep their property or home if they enter into an agreement with the defendants. The complaint alleges the defendants violated the CPA by (1) deceptive advertising; (2) soliciting, inducing, and executing overage play agreements; (3) soliciting, inducing, and executing partial interest deal agreements; (4) entering into fiduciary relationships with property owners, and failing to disclose material facts or failing to act on their behalf.

¶23 On May 11, Scamehorn, Morgan, Worthey, Fiscal Dynamics, Cumulative, Dove Realty, and Northwest Assets entered into a consent decree with the State. The defendants agreed to enter into an injunction that prohibited them from contacting or representing property owners subject to pending tax foreclosure. The defendants also agreed to pay $290,000 in restitution, $30,000 in costs and attorneys fees, $50,000 in civil penalties, and to provide to the attorney general a list of property owners eligible to receive restitution. Kaiser did not agree to enter into a consent decree.

¶24 After entry of the consent decree, Kaiser formed Unclaimed Funds. There is no dispute that Kaiser used Unclaimed Funds to contact former property owners who were entitled to restitution under the consent decree and offered to help them obtain the restitution money in exchange for a contingency fee. For example, Kaiser sent a letter on behalf of Dennis and Kelly Albertson to the

attorney general requesting $81,939 from the restitution fund, and instructed the attorney general to pay 70 percent to the Albertsons and the other 30 percent to Unclaimed Funds.

¶25 In May 2008, the State amended the complaint to name Unclaimed Funds as a defendant and alleged Kaiser committed an unfair or deceptive act and practice in violation of the CPA by soliciting property owners through Unclaimed Funds to assist in obtaining restitution funds.

¶26 In August 2008, the State and Kaiser entered into a stipulation to bifurcate the trial into two phases, liability and remedies. On August 7, the court entered an order bifurcating trial and scheduled the trial on liability to begin on December 8.

¶27 On October 24, the State filed a motion for partial summary judgment, arguing that a number of Kaiser's acts and practices violated the CPA. Kaiser did not contradict the evidence presented by the State. Kaiser argued that the solicitations and transactions were lawful and did not violate the CPA.

¶28 The court granted the State's motion for partial summary judgment. The court ruled that as a matter of law, Kaiser violated the CPA by engaging in a number of unfair or deceptive acts and practices in trade or commerce that impacted the public interest, including sending deceptive solicitations to property owners facing tax foreclosure, creating and enforcing unfair and unconscionable overage play transactions, intercepting tax overage funds in violation of the statutory requirement that the tax overage must be paid directly to the record owner, using attorneys and powers of attorney to obtain the overage, concealing the existence of overage funds, and falsifying real estate excise tax forms. The court also ruled that Kaiser violated the CPA by acting as both a trustee and cobeneficiary in partial interest deals, and in misleading former property owners by offering to obtain restitution funds.

¶29 In December 2008 and January 2009, the court heard testimony on whether Kaiser's partial interest deals

and other transactions violated the CPA.[3] The court found that the homeowners

> clearly have no idea as to the specifics of partial interest transactions. Some believed they were only getting loans. Some believed Mr. Kaiser would get some portion of their property if they did not repay him for paying the delinquent taxes. None realized they had lost all title and control of the property.

The court also found that

> [h]omeowners who enter the transactions believing they are saving their homes are actually stripped of any ownership interest and are not even given a right of first refusal to buy back their home. Mr. Kaiser can sell the property to anybody he wants at any price. . . . No fully-informed person, not acting under compulsion[,] would enter a transaction with such onerous terms.

The court concluded that the partial interest deals created by Kaiser omitted material facts and violated the CPA by creating "grossly unfair or unconscionable contracts," and the four other transactions testified to at trial violated the CPA. The court granted the State's request for injunctive relief and entered an "Order Imposing Penalties and Restitution."

## ANALYSIS

*Order on Partial Summary Judgment*

¶30 Kaiser contends the trial court on summary judgment erred in ruling as a matter of law that he violated the CPA by (1) intercepting overage funds the record property owners were entitled to receive, (2) using a power of attorney and the attorneys in order to conceal the existence of tax overage funds and obtain the funds, (3)

---

[3] Kaiser admitted at trial to using a computer-based program to automatically dial homeowners facing tax foreclosure to solicit for his schemes. After Kaiser testified, the court granted the state's motion to amend the complaint to add claims under the automatic dialing and announcing device law, incorporated under the CPA.

entering into unfair and unconscionable agreements, and (4) acting as both the trustee and the cobeneficiary in the partial interest deals.[4]

*Summary Judgment Standard of Review*

¶31 We review summary judgment de novo, engaging in the same inquiry as the trial court and viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hearst*, 154 Wn.2d at 501. A nonmoving party "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

*CPA*

¶32 Under the CPA, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. The purpose of the CPA is

> to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

RCW 19.86.920.

---

[4] Kaiser also argues that the State did not prove using the power of attorney to falsify real estate excise tax affidavits or that attempting to obtain a portion of the restitution money through his company Unclaimed Funds violated the CPA. Kaiser asserts that the evidence does not establish as a matter of law the capacity to deceive. Because Kaiser did not make this argument below, we decline to consider it for the first time on appeal. *Sneed v. Barna*, 80 Wn. App. 843, 847, 912 P.2d 1035 (1996). Moreover, the record does not support Kaiser's argument. The unchallenged findings establish that Kaiser falsified 29 real estate excise tax affidavits to avoid paying excise tax and sent out 500 solicitations for Unclaimed Funds. Unchallenged findings are verities on appeal. RAP 10.3(g).

¶33 Where, as here, the attorney general brings a CPA enforcement action on behalf of the State, it must prove (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, and (3) public interest impact. RCW 19.86.080(1); *see Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104, 114 n.22, 22 P.3d 818 (2001). Unlike in a private cause of action under the CPA, the State is not required to prove causation or injury, nor must it prove intent to deceive or actual deception. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986); *Nuttall v. Dowell*, 31 Wn. App. 98, 110, 639 P.2d 832 (1982).

¶34 The only dispute in this case is whether Kaiser committed unfair or deceptive acts or practices in violation of the CPA. While the CPA does not define the term "deceptive," the implicit understanding is that "the actor *misrepresented* something of material importance." *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wn. App. 722, 730, 959 P.2d 1158 (1998), *rev'd on other grounds*, 138 Wn.2d 248, 978 P.2d 505 (1999).

¶35 To prove that an act or practice is deceptive, neither intent nor actual deception is required. The question is whether the conduct has "the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785. Even accurate information may be deceptive " 'if there is a representation, omission or practice that is likely to mislead.' " *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (quoting *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)). Misrepresentation of the material terms of a transaction or the failure to disclose material terms violates the CPA. *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d, 298, 305-09, 553 P.2d 423 (1976). Whether particular actions are deceptive is a question of law that we review de novo. *Leingang v. Pierce County Med. Bureau*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

¶36 Below, Kaiser did not dispute any of the evidence submitted in support of the State's motion for partial summary judgment establishing his conduct. While Kaiser claims on appeal that there are material issues of fact, he relies on the undisputed evidence to argue the court erred in concluding that he violated the CPA. Where there is no "dispute that particular conduct occurred, the question [of] whether those actions give rise to a CPA violation is reviewable as a question of law." *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wn. App. 412, 438, 40 P.3d 1206 (2002); *see also Leingang*, 131 Wn.2d at 150.

*Intercepting Overage Funds*

¶37 The court found that Kaiser engaged in unfair and deceptive practices by "intercepting tax overage funds in violation of the protections contained in RCW 84.64.080." Kaiser contends that the court erred in ruling that Kaiser violated the CPA by intercepting payment of the proceeds from the tax foreclosure sale that the record owner was entitled to receive under RCW 84.64.080. Relying on *Stephenson v. Pleger*, 150 Wn. App. 658, 208 P.3d 583 (2009), Kaiser asserts the overage play transactions do not violate the statute.

¶38 Under RCW 84.64.050, if a property owner does not pay outstanding property taxes after receiving a certificate of delinquency, the county may foreclose on the property and RCW 84.64.080 unambiguously provides that any funds remaining after payment of the taxes and costs must be paid to the "record owner of the property" at the time the certificate of delinquency was issued. RCW 84.64.080 provides, in pertinent part:

> If the highest amount bid for any such separate unit tract or lot is in excess of the minimum bid due upon the whole property included in the certificate of delinquency, the excess shall be refunded . . . to the record owner of the property. The record owner of the property is the person who held title on the date of issuance of the certificate of delinquency. Assignments of interests, deeds, or other documents executed or recorded after

filing the certificate of delinquency shall not affect the payment of excess funds to the record owner.

¶39 Here, because Kaiser was never the record owner of the property when the county issued a certificate of delinquency, the primary purpose of the overage play agreement was to circumvent the statute, collect the overage funds due to the record owner, and avoid disclosing the property owner's right to obtain the overage.

¶40 *Stephenson* is distinguishable. In *Stephenson*, the court held that the trial court could not invalidate an agreement of the record owner to assign the overage under RCW 84.64.080 because the statute "has no impact on determining the rightful owner of the proceeds." *Stephenson*, 150 Wn. App. at 663. Here, unlike in *Stephenson*, the question is whether Kaiser violated the CPA by entering into agreements to conceal the existence of the overage funds and circumvent the mandatory requirement to pay the funds to the record property owner. Further, under the plain language of the statute, any subsequent assignment of interest to the overage funds "shall not affect the payment of excess funds to the record owner." RCW 84.64.080.

¶41 We conclude the court did not err in ruling as a matter of law that Kaiser committed an unfair and deceptive act or practice by inducing property owners facing tax foreclosure to enter into overage play agreements in order to sell the property at a tax foreclosure sale and intercept the overage funds in violation of RCW 84.64.080.

¶42 Kaiser also argues that the court erred in ruling that his use of a power of attorney and retaining attorneys to conceal the tax overage funds and obtain the funds was unfair or deceptive in violation of the CPA. As part of the overage play agreements, the property owner had to sign a power of attorney. Kaiser admits that he used the power of attorney to prevent the county from contacting the record property owner and obtain overage amounts due to the record owner following the tax foreclosure sale. Kaiser

would also hire an attorney to represent a property owner but instruct the attorney to pay the overage to him under the terms of the overage play agreement.

¶43 We conclude the trial court did not err in ruling that Kaiser committed unfair or deceptive acts or practices by using the power of attorney and hiring attorneys to purportedly represent the record owners in order to conceal the existence of the overage funds from the record owner and to obtain the overage.

¶44 Kaiser also contends the trial court erred in ruling that the creation and enforcement of the overage play agreements was "unfair and unconscionable under the [CPA]." It is a violation of the CPA to misrepresent the terms of a transaction or to fail to disclose material terms. *Ralph Williams*, 87 Wn.2d at 305-09. Grossly unfair or unconscionable contracts also violate the CPA. *See Ralph Williams*, 87 Wn.2d at 309. Because CPA enforcement actions implicate substantial harm to consumers, the test for unfairness and deception differs from traditional contract law defenses. *See Ralph Williams*, 87 Wn.2d at 309.

¶45 In determining whether the agreements were unconscionable and unfair, we examine " '[t]he manner in which the contract was entered,' whether [a party] had 'a reasonable opportunity to understand the terms of the contract,' and whether 'the important terms [were] hidden in a maze of fine print.' " *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 347, 103 P.3d 773 (2004) (alterations in original) (quoting *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 260, 544 P.2d 20 (1975)).

¶46 Here, there is no dispute that Kaiser solicited property owners facing tax foreclosure by offering to help save their property from foreclosure, and induced them to enter into agreements that misrepresented material facts. Kaiser purposefully withheld material information regarding the tax foreclosure sale, including the likelihood of receiving an overage, and buried any information about an overage in the numerous documents signed by the property owner. As

a matter of law, the overage play agreements were unfair and unconscionable agreements that violated the CPA.

¶47 Kaiser also claims the court erred in ruling that he violated the CPA by acting as both the trustee and a cobeneficiary of the land trusts used in the partial interest deals. A trustee has a fiduciary duty to act exclusively on behalf of the beneficiary and cannot put himself in a position where he is dealing with the trust for personal profit. *In re Estate of Drinkwater*, 22 Wn. App. 26, 30-31, 587 P.2d 606 (1978).

¶48 Here, there is no dispute that Kaiser took control of the property as the trustee in order to make a profit for himself as the cobeneficiary. As a cobeneficiary, Kaiser was entitled to a percentage of profit from the sale of the home. Kaiser failed to inform the homeowner about the terms of the trust or the consequences of failing to adhere to the terms of the trust agreement. There is no dispute that all of the homeowners who entered into a partial interest deal with Kaiser were in default and, under the terms of the agreement, lost any right to the property. The trial court did not err in ruling that Kaiser violated the CPA by acting as the trustee and cobeneficiary of the partial interest deal land trusts.

*Trial on Partial Interest Deals*

¶49 Kaiser claims the trial court erred by (1) allowing homeowners to testify about the terms of the partial interest deal transactions without first deciding that the agreements were ambiguous, (2) concluding that the partial interest deals violate the CPA, and (3) failing to enter a finding that four other transactions testified to at trial affected the public interest.

¶50 Where a court evaluates evidence in a bench trial, appellate review is limited to determining whether the findings are supported by substantial evidence and whether the findings support the conclusions of law. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001). "Substantial evidence" is the

"quantum of evidence sufficient to persuade a rational[,] fair-minded person the premise is true." *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We view the evidence and all reasonable inferences in the light most favorable to the prevailing party. *Korst v. McMahon*, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006). It is not the role of the appellate court to review credibility determinations on appeal. *Miles v. Miles*, 128 Wn. App. 64, 70, 114 P.3d 671 (2005). Unchallenged findings of fact are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004); RAP 10.3(g). We review questions of law de novo. *Sunnyside Valley*, 149 Wn.2d at 880.

### Homeowner Testimony

¶51 Kaiser claims the trial court erred in allowing homeowners to testify about the terms of the partial interest deal transactions without first determining whether the agreements were ambiguous. *National Bank of Washington v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973) does not support Kaiser's argument. *Equity Investors* expressly allows a party to a contract to offer testimony that contradicts the agreement if fraud, deceit, or coercion is alleged. *Equity Investors*, 81 Wn.2d at 912. Here, the record shows that the trial court found the agreements were ambiguous because Kaiser concealed the terms of the partial interest agreements and used "multiple complex and sometimes contradictory documents."

### Partial Interest Deals

¶52 Kaiser argues that the trial court erred in concluding that as a matter of law the partial interest deals violate the CPA. Kaiser claims the partial interest deals were not unfair or deceptive because the homeowners were able to avoid immediately losing their homes.

¶53 The undisputed findings establish that none of the homeowners understood the terms of the agreement or that the effect of the agreement was to divest them of title and control of the property. The unchallenged findings further

establish that the homeowners possessed tenuous and illusory rights to continue to live in their homes or to obtain any proceeds from a sale.

¶54 The trial court findings state the homeowners entered into partial interest deals believing that the deal would help them save their home but the deals actually stripped all ownership interest and control from the homeowners. The court found that Kaiser gave only minimal, vague, and misleading descriptions of the partial interest deals. The court also found that Kaiser omitted material terms in the course of soliciting homeowners, including the complete loss of control and the harsh extinguishment of their interest by being merely five days late on a rental payment. The evidence also showed that all of the homeowners were in default and that Kaiser never sold a property back to someone who entered into a partial interest deal.

¶55 The unchallenged findings support the trial court's conclusion that Kaiser engaged in deceptive and unfair acts and practices in violation of the CPA by inducing homeowners to enter into partial interest deals.

Testimony Regarding Four Other Transactions

¶56 The court found that "four other deals" that were testified to at trial also violated the CPA. Kaiser contends that because the trial court did not expressly mention the public impact in the findings pertaining to the four other deals, the State did not carry its burden of proving a violation of the CPA. We disagree.

¶57 The court findings establish that the four other transactions that involved homeowners facing foreclosure were unfair and deceptive. When read in context, the findings establish that Kaiser's acts have the substantial potential for repetition and affect the public interest. The oral ruling also makes clear that the trial court found that the transactions affected the public interest. The trial court expressly addressed the public interest prong in the context of all of Kaiser's business transactions.

*Injunctive Relief Order*

¶58 Kaiser argues that the injunctive relief order is overbroad because it prevents him from charging a contingent fee to represent property owners who are entitled to an overage. The injunction provides, in pertinent part:

Defendants are further ENJOINED from the following acts:

. . . .

Obtaining from the current or former owner of real property any assignment or other agreement that has or purports to have the final effect of transferring all or any part of excess tax foreclosure sale proceeds that would otherwise be paid to the record owner of the property, as that term is defined by RCW 84.64.[0]80.

¶59 This court reviews a trial court's decision to grant an injunction and the terms contained in the injunction for abuse of discretion. *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 209, 995 P.2d 63 (2000). Trial courts have broad discretionary power to fashion injunctive relief to fit the particular circumstances of the case before it. *Rupert v. Gunter*, 31 Wn. App. 27, 30, 640 P.2d 36 (1982). A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Based on the undisputed evidence and findings of fact and conclusions of law, the trial court did not abuse its discretion in preventing Kaiser from entering into agreements with property owners to obtain the proceeds remaining from a tax foreclosure sale.

*Attorney Fees*

¶60 Under RCW 19.86.080(1), the court has discretion to award the prevailing party reasonable attorney fees and costs. Upon compliance with RAP 18.1 the State is entitled to an award of reasonable attorney fees and costs.

¶61 We affirm.

GROSSE and BECKER, JJ., concur.