# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48970-8-II |
| Respondent, | |
| v. | |
| LA INVESTORS, LLC d/b/a LOCAL RECORDS OFFICE and ROBERTO ROMERO, a/k/a JUAN ROBERTO ROMERO ASCENCION, individually and as a member and manager of LA INVESTORS, LLC, and on behalf of the marital community comprised of Roberto Romero and Laura Romero; and LAURA ROMERO, individually and as a member and manager of LA INVESTORS, LLC, and on behalf of the marital community comprised of Roberto Romero and Laura Romero, | PUBLISHED OPINION |
| Appellants. | |

MELNICK, J. — LA Investors, LLC, d/b/a Local Records Office (LRO), appeals from the trial court's order granting partial summary judgment to the Washington State Attorney General's Office (State), and denying LRO's cross-motion for partial summary judgment.

We conclude that the trial court properly analyzed whether LRO's mailer had a capacity to deceive a substantial portion of the public as a matter of law and that the trial court properly granted the State summary judgment. We also conclude that the trial court did not err by imposing civil penalties against LRO for each mailer sent to consumers. We affirm.

FACTS

LRO is a California based company that solicits business in a number of jurisdictions, including Washington. LRO engages in the sale of goods and services, including marketing and selling copies of real property deeds. It is registered as a foreign limited liability company in Washington and has a mailbox at a United Parcel Service store in Olympia. Roberto Romero and his wife, Laura Romero, own, manage, and operate LRO.

## I.     THE MAILERS

In 2012, LRO began sending mailers to Washington consumers who had either recently purchased or refinanced a home. LRO also sent similar mailers to consumers in other states. In its mailer, LRO offered its product, a copy of the consumer's property deed, "the only document that identifies [you] as the property owner of [your home] by a recently recorded transferred title on the property" and a "property profile" that provided the "property address, owner's name, comparable values, and legal description or parcel identification number, property history, neighborhood demographics, public and private schools report." Clerk's Papers (CP0 at 24. LRO charged $89 for its product. A copy of the mailer envelope follows.



CP at 22.

The envelope contained LRO's two page mailer. It had no graphics or logos, only text.[1] The first page listed LRO's Olympia address at the top of the page and, underneath, the consumer's name, address, and a barcode. A copy of the first page follows.



---

[1] Later versions of the mailer contained small icons identifying payment options.

CP at 24.

Underneath the disclaimer was a detachable coupon. The coupon included a "PROPERTY ID NO.," a reference to the $89 "SERVICE FEE," a "PLEASE RESPOND BY" date, and "CHECK NO." CP at 24.

The second page of the mailer contained a list of largely irrelevant legal definitions related to real property and property ownership. Near the bottom of the page, a fourth disclaimer read in the same type:

> DISCLAIMER: * Local Records Office is not affiliated with any State or the United States or the County Records. Local Records Office is an analysis and retrieval firm that uses multiple resources that provide supporting values, deeds, and evidence that is used to execute a property reports [sic] and deliver a requested deed.
>
> Local Records Office is not affiliated with the county in which your deed is filed in, nor affiliated with any government agencies. This offer serves as a soliciting for services and not to be interpreted as bill due.

CP at 25.

LRO tracked the total number of mailings, complaints, stop payment requests, and refund requests it received, but did not track information as to customer satisfaction with its product.

Between June 2012 and February 2016, LRO mailed 256,998 solicitations to Washington consumers. Nine thousand six hundred ninety-five Washington consumers purchased LRO's product, a 3.9 percent response rate.

During this time, the State received numerous complaints regarding LRO's solicitations. Numerous government offices, media outlets, and consumer watchdog agencies nationwide disseminated consumer alerts regarding LRO's mailer, many of which characterized the mailer as a scam.

4

II.     THE LAWSUIT

In November 2013, the State filed a lawsuit against LRO and the Romeros, alleging a violation of the Consumer Protection Act (CPA).[2] Two years later, the State moved for summary judgment. It argued that LRO's mailer was a deceptive act that created a net impression that it was from a government agency or was a bill consumers had to pay. The State further argued that no material issues of fact were in dispute, and that the only disputed issue involved a question of law. The issue was whether LRO's mailer was unfair or deceptive. The State requested that LRO be enjoined from their allegedly deceptive practices and moved for restitution, civil penalties, and attorney fees and costs.

LRO filed a cross-motion for partial summary judgment. It argued that, as a matter of law, LRO's mailer was not a bill and was not deceptive in that regard; neither LRO's envelope nor mailer as a whole resembled a mailing from a government agency or title company; and, that the disclaimers LRO used were sufficient to counter any net impression that the mailer was a bill or from a government agency or title company.

The State supported its motion with 25 declarations from Washington consumers who received LRO's mailer. Some consumers stated that the timing of the mailer coupled with the "official looking" envelope and the Olympia address made it seem like it demanded attention and came from a government organization. CP at 625. Some stated that, upon receiving the mailer, they believed there was a problem with their property transaction. Others believed the mailer either came from a government agency or was a bill. Some believed that the sender would penalize them for failing to pay $89. Consumers also stated that the "respond by" date created a sense of urgency to comply. Even after reading the mailer and its disclaimers in full, some believed the

---

[2] Ch. 19.86 RCW.

mailer was suspicious, and that LRO was attempting to mislead or deceive homeowners. Others declared that only after paying and receiving a "very unofficial looking property profile" from LRO did they realize they were "scammed" and they asked for a refund. CP at 635, 638, 649.

The State also submitted evidence that deeds were typically one to two pages in length, and that, by law, the Auditor's Office charged nominal amounts for certified and non-certified copies of deeds.[3] It also submitted evidence that companies such as HouseFax.com offered detailed property profile reports for free and charged $19 thereafter for additional reports.

Additionally, the State submitted evidence of enforcement actions or settlements multiple other states entered into with LRO regarding the same or similar deceptive conduct. It also submitted evidence that in 2011, Romero voluntarily surrendered his California real estate license to settle an action by the California Department of Real Estate which alleged "misrepresentations" and "fraud and/or dishonest dealing[s]" with consumers. CP at 415.

Both parties supported their motions with their respective experts' reports and deposition testimony. The State retained Dr. Anthony Pratkanis, a psychology professor at the University of California, Santa Cruz. Pratkanis taught courses in social psychology, research methods, consumer psychology, marketing management, and buyer behavior. His primary area of research and study involved social influence and belief formation, including deceptive advertising and sales practices. He published numerous books and articles on these topics.

Pratkanis reviewed the consumer declarations and complaints, consumer alerts from various government authorities, LRO's mailer, and LRO's response rate. Citing to studies and articles, Pratkanis opined that the response rate for LRO's mailers in Washington was "two to three

---

[3] RCW 36.18.010(2) & (3) (for certified copies, $3.00 for the first page and $1.00 for each page thereafter; for non-certified copies, $1.00 per page).

times the expected rate of average response for comparable mailers." CP at 353. He noted that LRO's mailer enjoyed a high response rate, even though it failed to use many of the most effective methods used in direct mail to increase response rates, "such as offering free gifts and free trials, providing money-saving offers, highlighting testimonials concerning the value of the product, and featuring prominently money-back guarantees of satisfaction." CP at 353. As to the significance of complaint rates, he cited to a number of studies and opined:

> In general, consumers do not often complain even when dissatisfied with a purchase and rarely complain to third parties such as the government. . . . When confronted with a defective service or product, the two most common responses by consumers . . . is to (a) do nothing or (b) take private action such as quit purchasing the product or engage in negative word of mouth of the product.

CP at 370.

Pratkanis opined that LRO engaged in a deceptive sales practice by leading consumers to believe they received a bill from a government agency or a title company, or that they needed to have a copy of a deed to prove ownership of their home. In reaching his opinion, Pratkanis used established theories, his knowledge of influence tactics, and the science of consumer behaviors and social influence. While he did not conduct an independent survey or focus group, he conducted a "social influence analysis" by reviewing the mailer and the influence tactics LRO used. CP at 993. In its response to the State's motion, LRO objected to Pratkanis's opinion, arguing that it was "demonstrably unscientific" and "not admissible under ER 702."[4] CP at 1009.

LRO retained Dr. Albert Bruno, a marketing professor at Santa Clara University. Bruno taught courses in marketing, marketing research, and marketing strategy. Bruno opined that LRO's response rate was not necessarily an indication of a deceptive marketing strategy. He

---

[4] The trial court did not explicitly rule on this objection, but seemingly overruled it because it made clear in its oral ruling and written order that it considered both parties' experts' opinions.

7

further noted that LRO's complaint rate was "relatively low" and that Pratkanis failed to review the complaint rate and refund requests. CP at 1048.

Bruno further opined that LRO's mailer actually did a poor job of engaging potential consumers. He did not address the composition of LRO's mailer in his report, but testified during his deposition that the mailer had a "flat" effect and that it could be "enhanced." CP at 446. He opined that LRO's complaint rate was significantly lower than would generally be expected for such a mailer.

In response to why some consumers had to go to their escrow officer for further clarification regarding LRO's mailer, Bruno stated that "it takes all kinds" and that the government could not protect against every individual who misinterpreted the mailer. CP at 893. He stated, "It kind of says a population is made up of very smart people who don't read, very dumb people that can't read, and people that get confused every second of the day by everything." CP at 893. Bruno also did not conduct focus groups. He did not review any consumer complaints or consumer alerts in reaching his opinions.

The trial court partially granted the State's motion, denied LRO's motion, and permanently enjoined LRO from engaging in any other deceptive practices. The court ruled that, as a matter of law, LRO's mailer was unfair and deceptive because it had the capacity to deceive a substantial portion of the public.[5] It specified that LRO "created the deceptive net impression" that its mailer was "from a governmental agency or was a bill that Washington consumers were obligated to

---

[5] LRO sent different versions of its mailer to Washington homeowners. For example, the original mailer stated homeowners could obtain a copy of their deed "FOR UP TO $89.00." CP at 10. After November 2012, LRO omitted this phrase, and later added the language "FOR A NOMINAL FEE." CP at 628. In 2014, LRO also removed the language "RESPOND PROMPTLY" from the mailer's envelope. CP at 323 n.2. Later versions of the mailer also added small icons identifying payment options. The trial court applied its ruling to all versions of the mailer.

8

respond to or pay." CP at 1182-83. The court also ruled that the State proved all elements of a CPA violation.

III.     CIVIL PENALTIES

At a later hearing, the trial court heard argument on civil penalties. The State argued that the court should impose a $10 penalty for each of the mailers sent that did not result in a purchase, and $89 for each of the mailers sent that did result in a purchase. LRO argued that ordering both restitution and civil penalties was excessive.

Both parties cited to *United States v. Reader's Digest Association, Inc.*, 662 F.2d 955 (3rd Cir. 1981), which outlined five factors that a trial court may use to determine the penalty amount. The trial court stated that it would consider the factors, but it was not bound by them. The court noted that the maximum penalty allowed by statute would be roughly $23 million.

The trial court imposed a $2,569,980 penalty against LRO. The court reached that amount by assessing a $10 penalty for each of LRO's 256,998 solicitations mailed to Washington consumers between June 2012 and February 2016. In selecting a single penalty amount for all solicitations, the trial court chose not to distinguish between consumers who accepted LRO's offer and those who did not. The court reasoned that regardless of the outcome, "the unfair and deceptive act . . . happened when the Defendants mailed out the mailer." RP (Mar. 16, 2016) at 67. The court found that LRO did not submit evidence of its inability to pay any imposed penalties, and further reasoned:

> This civil penalty will eliminate any benefits derived by the Defendants from their deceptive practices, and also will vindicate the authority of the [CPA] to protect Washington consumers from unfair and deceptive acts.
>
>        . . . .
>
> [T]he Court also finds that Defendants . . . acted in bad faith. The acts and practices described herein were not isolated instances of misjudgment, but rather, an

intentional and deliberate practice perpetuated between June 2012 and February 2016. Defendants' violations caused substantial injury to the public and as early as 2013 Defendants were put on notice by Plaintiff that the [LRO] solicitation had the capacity to deceive. Defendants nevertheless continued to disseminate thousands of solicitations in Washington.

CP at 1308.

The trial court entered a judgment for the State and ordered LRO to pay restitution and attorney fees and costs, in addition to civil penalties.

LRO appeals.

## ANALYSIS

I.     SUMMARY JUDGMENT

LRO argues that the trial court erred by granting the State summary judgment by concluding, as a matter of law, that its mailer was deceptive and in violation of the CPA because it had the capacity to deceive a substantial portion of the public. We disagree.

A.     STANDARD OF REVIEW

We review rulings on motions for summary judgment de novo, engaging in the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe all facts and their reasonable inferences in the light most favorable to the nonmoving party. *Jones*, 146 Wn.2d at 300.

The party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). "A material fact is one upon which the outcome

of the litigation depends in whole or in part." *Atherton*, 115 Wn.2d at 516. If the moving party satisfies its burden, the nonmoving party must present evidence demonstrating that a material fact remains in dispute. *Atherton*, 115 Wn.2d at 516. If the nonmoving party fails to demonstrate that a material fact remains in dispute, and reasonable persons could reach but one conclusion from all the evidence, then summary judgment is proper. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

Because we examine the case de novo, we "not only review[ ] the decision of the trial court[,] but may also determine whether the trial court's decision can be affirmed on alternate grounds." *Smith v. Stockdale*, 166 Wn. App. 557, 563, 271 P.3d 917 (2012).

B. THE TRIAL COURT PROPERLY GRANTED THE STATE SUMMARY JUDGMENT

1. THE TRIAL COURT APPLIED THE CORRECT STANDARD

In this case, the only issue is whether LRO committed an unfair or deceptive act in violation of the CPA because its mailer had the capacity to deceive a substantial portion of the public. LRO asserts this issue presents a question of fact. We disagree, and conclude that the trial court properly analyzed the issue as a question of law.[6]

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. "Where, as here, the Attorney General brings a CPA enforcement action on behalf of the State, it must prove (1) an unfair or deceptive act or practice[,] (2) occurring in trade or commerce, and (3) public interest impact." *State v. Kaiser*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011).

---

[6] The State argues that LRO did not preserve the issue below. We disagree with the State and address whether LRO's mailer was unfair or deceptive on the merits.

This case focuses on the CPA's element that LRO's act or practice was unfair or deceptive. An act is unfair or deceptive if it "had the capacity to deceive a substantial portion of the public." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009). Thus, the CPA only requires the State to show capacity to deceive. *Panag*, 166 Wn.2d at 47. The State is not required to prove causation, injury, intent to deceive or actual deception. *Kaiser*, 161 Wn. App. at 719.

Whether an act is unfair or deceptive under the CPA is a question of law. *State v. Mandatory Poster Agency, Inc.*, 199 Wn. App. 506, 520-22, 398 P.3d 1271, *review denied*, 189 Wn.2d 1021 (2017). *Mandatory Poster* held that whether an undisputed act had the capacity to deceive a substantial portion of the public is a question of law. 199 Wn. App. at 519-20.

The Washington pattern jury instruction, "Definition—Unfair or Deceptive Act or Practice", is consistent with this interpretation. 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS (WPI): CIVIL 310.08, at 43 (6th ed. Supp. 2013). The comments to the instruction state, "Whether an alleged act constitutes an unfair or deceptive act or practice covered by the CPA is a question of law that appellate courts review under the de novo standard . . . It is a question of fact whether the defendant committed a specific action or practice." WPI 310.08, cmt. at 43.

LRO, citing federal decisions, argues that capacity to deceive is a question of fact. *See Giant Food, Inc. v. Fed. Trade Comm'n*, 322 F.2d 977, 982 n.12 (D.C. Cir. 1963); *Carter Prods. Inc., v. Fed. Trade Comm'n*, 268 F.2d 461, 496 (9th Cir. 1959). Washington courts are instructed to look to appropriate federal court decisions for guidance when addressing issues involving the CPA. RCW 19.86.920. But federal court decisions are guiding, not binding, authority. *Panag*, 166 Wn.2d at 47. And as the State points out, some federal court decisions hold that capacity to deceive is a question of law. *See Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 929 (9th Cir.

2009); *Consumer Fin. Port. Bur. v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016)). "In the final analysis, the interpretation of RCW 19.86.020 is left to the state courts." *State v. Reader's Digest Ass'n.*, 81 Wn.2d 259, 275, 501 P.2d 290 (1972). We determine the issue is one of law, not fact.

Accordingly, we conclude that the trial court properly analyzed whether LRO's mailer had the capacity to deceive a substantial portion of the public as a question of law, and we review de novo the trial court's conclusion that LRO's acts were unfair or deceptive under Washington's CPA.

### 2. LRO'S MAILER HAD THE CAPACITY TO DECEIVE A SUBSTANTIAL PORTION OF THE PUBLIC

LRO argues that the State failed to establish that LRO's mailer had the capacity to deceive a substantial portion of the public that the mailer was from a government agency. It argues that the State failed to quantify the alleged deception or establish that the mailer would likely deceive reasonable consumers. LRO's argument flows from the mistaken premise that capacity to deceive under the CPA is a question of fact. Again, the trial court properly analyzed the issue as a question of law. LRO's arguments therefore misconstrue the CPA and the State's burden of proof. LRO's interpretation that the CPA requires the State to show intent to deceive, or to prove actual deceit, is incorrect. We reject as irrelevant LRO's assertion that, as a factual matter, the mailer was not deceptive. Our sole task is to determine whether, as a matter of law, LRO's mailer has the capacity to deceive a substantial portion of the public. We conclude that it does.

### i. LRO'S MAILER CONVEYED A NET IMPRESSION THAT IT WAS FROM A GOVERNMENT AGENCY

The undisputed facts are as follows: LRO sent the mailer in this case to over 200,000 consumers, generating over 9,000 paid responses. There is no question that the mailers reached a substantial portion of the public. Numerous consumers complained that they believed the mailer

was from a governmental agency or a bill they were required to pay. In their declarations, the consumers stated that the "respond by" date also created a sense of urgency to comply. Some consumers, even after reading the mailer and its disclaimers, felt like LRO attempted to mislead homeowners.

The State need only show that the act or practice of sending LRO's mailer "had the capacity to deceive a substantial portion of the public." *Panag*, 166 Wn.2d at 47. The undisputed facts establish that LRO sent the mailer to Washington consumers. As a matter of law, this act or practice was deceptive if the mailer contained a representation or omission likely to mislead a "reasonable" or "ordinary" consumer. *Panag*, 166 Wn.2d at 50 (further noting the implicit understanding that what is misrepresented must be of material importance); *Kaiser*, 161 Wn. App. at 719.

A deceptive act or practice is measured by the "'net impression'" on a reasonable consumer. *Panag*, 166 Wn.2d at 50 (quoting *Fed. Trade Comm'n v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)). A communication can be accurate and truthful, yet still be deceptive if the "'net impression' it conveys" is deceptive. *Panag*, 166 Wn.2d at 50 (quoting *Cyberspace.Com LLC*, 453 F.3d at 1200).

The State has met this burden. As the State's expert testified,[7] the mailer in this case repeatedly featured the official-sounding name of the sender—"Local Records Office"—and contained the prominent banner reading "County Public Information." The mailer appeared

---

[7] LRO argues that the State's expert's opinions were baseless and inadmissible expert testimony regarding whether the mailer was deceptive. We disagree. Pratkanis qualified as an expert because of his education and experience in social psychology, social influence, and consumer psychology. His opinion regarding the mailer's capacity to deceive and the net impression it conveyed, from a consumer's perspective, was helpful to the trial court in determining whether, as a matter of law, it had the capacity to deceive. *See* ER 702.

governmental in its formatting and language. It bore a return address of the same city as the seat of our state government. The envelope referenced the United States code. After reviewing the record, we agree that as a matter of law the mailer in this case had the capacity to deceive. Based on the net impression conveyed by the mailer, an ordinary consumer could reasonably have been misled to believe it was a government document.

LRO argues that the consumer declarations submitted by the State did not establish the mailer's capacity to deceive a substantial portion of the public. It argues that the declarations only showed that consumers who skimmed through the mailer and assumed it was from a government agency were not "reasonable" consumers. Br. of Appellant at 26. Again, these arguments misconstrue the issue at bar as a factual question. It is not. Establishing the speed at which so-called "reasonable" consumers read their mail is not part of the "unfair or deceptive" legal analysis under the CPA. Nor is the State required to establish whether consumers were actually deceived.[8] This argument is irrelevant and falsely premised on LRO's argument that we are making a factual determination.

LRO also argues that the State failed to quantify the alleged deception. Br. of Appellant at 25-26. It argues that over 96 percent of the mailer's recipients did not respond to the mailer and that the State received few complaints relative to the number of mailers sent. Br. of Appellant at 25. Again, LRO's argument misses the point. Even assuming LRO's factual assertions are accurate, they are irrelevant to whether the State has met its burden under the CPA. The State is not required to prove actual deception nor to quantify the exact number of consumers that were deceived. *Kaiser*, 161 Wn. App. at 719.

---

[8] Although many of the declarations do demonstrate deception, revealing that many recipients believed the mailer was from a government agency and that they were required to pay $89.

ii.    LRO'S MAILER CONVEYED A NET IMPRESSION THAT IT WAS A BILL

LRO argues that the State failed to establish that LRO's mailer had the capacity to deceive a substantial portion of the public that it was a bill.  LRO asserts that the State did not adequately support its assertion that the mailer's inclusion of personalized information, a reply coupon, and the phrase "Please Respond By" were "elements . . . common to bills and not solicitations."  Br. of Appellant at 33.

Once again, LRO's argument incorrectly frames the issue on appeal as a factual question of evidentiary sufficiency.  As discussed above, whether the mailer had the capacity to deceive is a question of law.  Based on the undisputed facts, we conclude that the net impression the mailer conveyed had the capacity to deceive.

LRO focuses on a few aspects of the mailer to argue that the State failed to prove that the mailer looked like a bill.  LRO misconstrues the State's burden.  As a matter of law, the State only needed to show that LRO's mailer had the capacity to deceive, not that it had "elements common to bills and not solicitations."  Br. of Appellant at 33.  Moreover, LRO's selective focus on certain characteristics is inconsistent with established case law.  Under the CPA, a deceptive act or practice is measured by the "'net impression'" on a reasonable consumer.  *Panag*, 166 Wn.2d at 50 (quoting *Cyberspace.Com LLC*, 453 F.3d at 1200).

The mailer in this case could have been reasonably mistaken for a bill.  The State's expert opined that the mailer mimicked a bill by including: the recipient's personalized information; reply coupon; the frequent presence of the name "Local Records Office"; the banner reading "County Public Information"; LRO's Olympia address; a specified but artificial deadline; and the second page of the mailer which was filled with largely irrelevant, but authoritative language.  The expert also stated that Romero knew consumers were more inclined to respond if he posted a deadline on

the mailer, and opined that $89 for a copy of a deed and property profile was not an accurate representation for such documents. Citing to studies, the expert further opined that the "Please Respond" message created a sense of urgency to respond—"rush[ing] the consumer into compliance," CP at 356,—and that such deadlines increased the probability of response. He concluded that, given the mailer's features, the use of an artificial deadline was a deceptive strategy.

After reviewing the record, we agree. The particular mailer in this case was deceptive because it had the capacity to convince reasonable consumers that it was a bill the consumer had to pay.[9]

### iii. THE DISCLAIMERS DID NOT CURE THE POTENTIAL FOR DECEPTION

Lastly, LRO argues that its "conspicuous" disclaimers countered any of the mailer's misleading impressions. Br. of Appellant at 35-38. The State argues that LRO's disclaimers are insufficient to cure the mailers' capacity for deception. Again, we agree with the State.

Washington and federal courts have recognized that disclosures or disclaimers "do not always cure the potential for deception." *Mandatory Poster*, 199 Wn. App. at 523; *Panag*, 166 Wn.2d at 50; *Cyberspace.Com*, 453 F.3d at 1200. Disclaimers are inadequate unless they are "sufficiently prominent and unambiguous to change the apparent meaning of the claims and to

---

[9] LRO also argues that the response rate to the mailer and the "asserted worthlessness" of LRO's product was not a proper basis to find capacity to deceive as a matter of law. Br of Appellant at 34-35. It also argues that the number of complaints or requested refunds did not establish that LRO's product and service was worthless or deceptive. But LRO does not show that the response rate and value of its product provided the basis on which the trial court found a capacity to deceive, or the basis on which the court found that the mailer conveyed a net impression it was from a governmental agency or was a bill. Further, the State's expert's opinion as to LRO's "high" response rate went to the expert's opinion that LRO's mailers were effective, not necessarily to the likelihood of consumer deception as LRO contends.

leave an accurate impression." *Removatron Int'l Corp. v. Fed. Trade. Comm'n*, 884 F.2d 1489, 1497 (1st Cir. 1989). "Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron*, 884 F.2d at 1497.

Here, the disclaimer "THIS IS NOT A GOVERNMENT DOCUMENT" on the mailing envelope was overshadowed by a boxed and bolded "WARNING" notation regarding mail fraud. CP at 22. It was also overshadowed by the language "IMPORTANT PROPERTY INFORMATION" and "RESPOND PROMPTLY" located next to it, near the center of the envelope. CP at 22.

Other disclosures were embedded in the body of the mailer and not prominently placed. CP at 24-25. In the top right corner of the mailer, the disclaimer, in all caps but small type, "THIS SERVICE TO OBTAIN A COPY OF YOUR DEED OR OTHER RECORD OF TITLE IS NOT ASSOCIATED WITH ANY GOVERNMENTAL AGENCY," was overshadowed by the boxed and bolded language, "Please Respond By" and an enlarged and highlighted date. CP at 24. Another disclaimer appeared near the bottom of the mailer. But that disclaimer was also overshadowed by the coupon to remit payment located below it, which also took up one-fourth of document space. Due to its placement and formatting, the disclaimer on the second page of the mailer read as though it was part of the list of definitions.

Additionally, both experts acknowledged that consumers do not read every word or read in detail the content of documents. As Pratkanis noted in his report, a more effective way of correcting misperceptions is to design the mailer in such a way that there is no initial misperception. He also noted, citing to various studies, that text set in all caps was harder to read than text in mixed case; thus, a consumer may miss a key word, e.g. "NOT," which could radically

change the meaning of the text. CP at 360. Considering the format and placements of the various disclaimers, the disclaimers do not cure the potential for deception.[10]

Accordingly, we conclude that, as a matter of law, LRO's mailer was an unfair or deceptive act that had the capacity to deceive a substantial portion of the public. The trial court properly granted the State's motion for summary judgment.[11]

## II. CIVIL PENALTIES

LRO argues that the trial court abused its discretion by imposing a $10 penalty for each of the mailers that consumers did not respond to—the same penalty it imposed for each mailer that resulted in a sale. We disagree.

The CPA authorizes civil penalties of up to $2,000 per violation of RCW 19.86.020. RCW 19.86.140. The statute does not limit the possible number of violations to the number of aggrieved consumers. Each deceptive act is a separate violation. *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 317, 553 P.2d 423 (1976) (also recognizing the potential for

---

[10] LRO further argues that the First Amendment gives advertisers broad freedom with respect to the design and contents of their mailers. Appellants' Opening Br. at 32 ("[A]dvertisers have significant leeway in content and design and are not required to mimic advertisements the government considers typical so that consumers will instantly recognize them as advertisements."). Advertisers' freedom to design their own advertisements, however, does not grant them the right to deceive consumers. *See Friedman v. Rogers*, 440 U.S. 1, 9, 99 S. Ct. 887, 59 L. Ed. 2d 100 (1979) (First Amendment allows regulation of "false, deceptive, and misleading commercial speech."). The trial court's determination that the mailer in this case was deceptive did not infringe on LRO's First Amendment rights.

[11] LRO additionally assigns error to the trial court's denial of its cross-motion for partial summary judgment because no reasonable trier of fact could conclude that either the text or design of its mailer had the capacity to deceive a substantial portion of the public that it was a government document or a bill. Because review is de novo and the only issue in dispute is whether the LRO's mailer was unfair or deceptive, our analysis above addresses this issue. We conclude that the trial court did not err by denying LRO's cross-motion.

multiple violations per consumer). CPA penalties are valid even if the trial court finds that the consumers did not rely on the appellant's wrongful conduct. *Ralph Williams'*, 87 Wn.2d at 317.

"We review the trial court's assessment of civil penalties within the statutory limits [of the CPA] for an abuse of discretion." *Mandatory Poster*, 199 Wn. App. at 525. "An abuse of discretion occurs when a decision is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Mayer v. Sto Industries, Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006) (quoting *Associated Mortg. Inv'rs v. G.P. Kent Constr. Co.*, 15 Wn. App. 223, 229, 548 P.2d 558 (1976)).

As they did at the trial court, both parties cite to *Reader's Digest*, a federal mass mailing case under an analogous consumer protection standard. 662 F.2d at 959-60. In that case, the federal court held that Reader's Digest committed over 17 million violations, and that each letter distributed in the mass mailing constituted a separate violation. *Reader's Digest*, 662 F.2d at 959-60. The court identified five factors to consider in determining the appropriate penalty: (1) whether defendants acted in good faith, (2) injury to the public, (3) defendant's ability to pay, (4) desire to eliminate any benefits derived by the defendants from the violation at issue, and (5) necessity of vindicating the authority of the law enforcement agency. *Reader's Digest*, 662 F.2d at 967.

Here, the trial court applied the *Reader's Digest* factors to determine civil penalties and imposed a $10 penalty for each of the 256,998 mailers sent to Washington consumers. Finding that LRO's actions were in bad faith and recognizing that there was no evidence of LRO's inability to pay, the trial court explained that the civil penalty would "eliminate any benefits derived by [LRO] from their deceptive practices, and also will vindicate the authority of the [CPA] to protect Washington consumers from unfair and deceptive acts." CP at 1308.

LRO argues that an application of the *Reader's Digest* factors does not support the imposition of penalties for mailers that were discarded or did not receive a response. But the federal *Reader's Digest* factors, while helpful, are not mandatory considerations for Washington courts. *Mandatory Poster*, 199 Wn. App. at 526. Instead, the amount of civil penalties assessed under the CPA falls within trial courts' discretionary authority. *See Etheridge v. Hwang*, 105 Wn. App 447, 459, 20 P.3d 958 (2001). In this case, the trial court chose to consider the factors and explained why it was imposing civil penalties. LRO does not show why or how the trial court's determination was "manifestly unreasonable," and thus fails to demonstrate abuse of discretion. *See Mayer*, 156 Wn.2d at 684.

Because the mailer was deceptive and because each deceptive act was a separate violation, the trial court's decision was not manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Mayer*, 156 Wn.2d at 684. Accordingly, we conclude that the trial court did not abuse its discretion in imposing civil penalties for each of the mailers sent, including those that did not receive a response.

III. ATTORNEY FEES ON APPEAL

The State requests us to award attorney fees and costs pursuant to RAP 18.1(b). LRO argues that we should decline to award additional fees and costs due to the large judgment the State obtained below and because LRO's appeal raised legitimate issues regarding the trial court's decision.

The prevailing party is entitled to attorney fees and costs on appeal if applicable law grants to a party the right to recover and that party includes such a request in its opening brief. RAP 18.1(a)-(b). Under RCW 19.86.080(1), we have "discretion to award the prevailing party reasonable attorney fees and costs." *Kaiser*, 161 Wn. App. at 726. Because the State is the

prevailing party in this appeal and included its request in its opening brief, we conclude that, in compliance with RAP 18.1(d), the State is entitled to an award of reasonable attorney fees and costs.

We affirm.

Melnick, J.

We concur:

Johanson, P.J.

Lee, J.